851 F.2d 822
 48 Ed. Law Rep. 53
 Vickie FROST, Plaintiff-Appellee, (86-5680),
Plaintiff-Appellant, (86-5706),
v.
HAWKINS COUNTY BOARD OF EDUCATION, Defendant-Appellant, (86-5680),
Jean Price, personally and in her official capacity as an
employee and agent of Hawkins County Board of Education
serving as principal of Church Hill Elementary School,
Church Hill, Tennessee; Joe Ashbrook, personally and in his
official capacity as an employee and agent of the City of
Church Hill, Tennessee serving as Chief of Police; Hawkins
County Board of Education, a sub-division of the government
of Hawkins County; Bill Snodgrass, Superintendent of the
Board of Education in Hawkins County, Defendants-Appellees, (86-5706).
 Nos. 86-5680, 86-5706.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 21, 1987.
Decided July 12, 1988.
 
 Richard M. Currie, Jr. (argued), (Bd. of Ed.) Wilson, Worley, Gamble and Ward, P.C., Kingsport, Tenn., for defendant-appellant.
 Larry E. Parrish (argued), (Frost) Fred M. McDonald, Steven Royce Mills, Parrish & Shaw, Memphis, Tenn., for plaintiff-appellee.
 Robert L. Cheek (argued), Knoxville, Tenn., Charlton R. DeVault, Jr. (argued), Kingsport, Tenn., for B. Snodgrass.
 Kent Herrin (argued), John City, Tenn., for City of Church Hill and Joe Ashbrook.
 Before MARTIN, JONES and WELLFORD, Circuit Judges.
 NATHANIEL R. JONES, Circuit Judge.
 
 
 1
 In this civil rights action alleging prior restraint, false imprisonment and malicious prosecution, defendant Hawkins County Board of Education appeals the jury verdict for plaintiff-appellant Vickie Frost. Frost appeals the denial of certain pretrial and postjudgment orders. Upon consideration, we find that there is no basis for judgment against the defendant. Thus, we hereby reverse the district court's decision and grant a judgment notwithstanding the verdict for the Hawkins County School Board. We also affirm the district court's grant of a directed verdict in favor of the City of Church Hill and the jury's verdicts in favor of defendants Ashbrook, Price and Snodgrass.
 
 I.
 
 2
 On November 20, 1984, pursuant to 42 U.S.C. Section 1983, plaintiff Vicki Frost, a parent with three children in the Hawkins County School System, sued the Hawkins County Board of Education ("the Board"); Bill Snodgrass, Superintendent of Hawkins County Schools; Jean Price, Principal of Church Hill Elementary School; Joe Ashbrook, Chief of Police for Church Hill, Tennessee; and the City of Church Hill, an incorporated municipality. In her suit, Frost alleged violations of her constitutional rights under the first and fourteenth amendments.
 
 
 3
 To a large extent, the instant case arises out of the same factual circumstances as Mozert v. Hawkins County Bd. of Educ., 827 F.2d 1058 (6th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1029, 98 L.Ed.2d 993 (1988). The controversy in both cases began in September 1983, when a group of "born-again" Christian parents expressed their disapproval of a new series of Holt, Rinehart & Winston reading books.[1] These parents objected to the books because they considered the values which the books seem to endorse (i.e., secular humanism, evolution, and non-Christian religions) to be repugnant to their beliefs. To inform the School Board and the general public of their views, the parents joined to form an organization called Citizens Organized for Better Schools. Frost was particularly active in this organization, giving interviews to several newspaper, television and radio reporters in addition to speaking at meetings of the Hawkins County Board of Education.
 
 
 4
 In an effort to accommodate offended parents, the School Board allowed Church Hill Middle School students who were offended by the new textbooks to be taught from an older reading series. Two of Frost's three children attended the Middle School and were given reading lessons from the older books.
 
 
 5
 Frost's third child, Sarah, a second grade student at Church Hill Elementary School, was unaffected by the Board's compromise. Thus, Frost sought permission from Church Hill Elementary school principal, Jean Price, to allow Frost to teach Sarah reading. After learning that Frost wanted to give Sarah her lesson while Sarah's classmates were being taught how to read by their regular teacher, Price told Frost that oral reading and comprehension were graded separately and that Sarah would receive a failing grade in oral reading if she did not read from the approved textbook. She also told Frost that Sarah's repeated absences from reading class would be reported to the Hawkins County attendance supervisor. Despite these warnings, each day Frost would go to Sarah's school, remove her from her classroom before the regular reading lesson began, take her to the school's library or cafeteria and give her a reading lesson from an older reading textbook. At the end of the lesson, Frost would take Sarah back to her classroom for instruction in the other subjects.
 
 
 6
 The Board countenanced both Frost's teaching of Sarah and the use of older reading textbooks to teach some students in the Church Hill Middle School until November 10, 1983, when the Board passed a resolution requiring all students in Hawkins County to use only those textbooks which were currently approved by the Board. As a result of the resolution, it became clear that the Board would no longer compromise with parents who objected to the use of the Board-approved textbooks. Consequently, seven families--14 parents and 17 school children--brought suit on December 3, 1987, to challenge the resolution. They sought injunctive relief and money damages for alleged violation of their first amendment right to freely exercise their religion. The case, to which Frost was a party, was Mozert, 827 F.2d 1058. Although the plaintiffs won in district court, a panel of this court reversed and held that the requirement that public school students study a basic reader series chosen by school authorities did not create an unconstitutional burden under the free exercise clause. Thereafter, the Supreme Court denied the plaintiffs' petition for certiorari.
 
 
 7
 With regard to the instant action, following the November 10, 1983 resolution, Price told Frost that her daily practice of taking Sarah from reading class was not only unwise but in violation of Board policy. Having stated this, Price refused to continue to let Frost use the school's facilities or grounds to teach Sarah. Rather than discontinuing her lessons, however, Frost took Sarah to the school's parking lot and attempted to give Sarah her reading lesson in the family car. Price consulted with Bill Snodgrass, the Superintendent of Schools, on whether Frost's conduct violated the Board's policy. Snodgrass told Price to call the police and get them to stop Frost's practice of removing Sarah from class to teach her how to read. On November 22, 1983, Church Hill Police Chief Joe Ashbrook came to the school at Price's request and asked Frost to leave. She left and Sarah rejoined her class.
 
 
 8
 The next day, November 23, 1983, following the advice of counsel, Frost attempted to resume her practice of removing Sarah from class. However, when she arrived at Sarah's school, Price again stopped her. Price restated the Board's policy and a sharp dispute ensued. This time Frost called the police. Again, Police Chief Ashbrook came to the school. After some discussion, Chief Ashbrook read Frost the Tennessee code section regarding persons improperly on school premises (Tenn.Code Ann.Section 49-818 ("T.C.A."), recodified as T.C.A. Section 49-6-2008 (1983)).[2] He then told Frost that, pursuant to that code section, she had a right to be on school premises only so long as she had lawful and valid business. He told her that since the school's principal had told her that she no longer had valid business on the premises, she would have to leave. When Frost refused, Chief Ashbrook arrested her and took her to jail. After conferring with a General Sessions Court Judge and the District Attorney General, Chief Ashbrook executed an affidavit of complaint charging Frost with violations of T.C.A. Sec. 49-818, and another code section, T.C.A. Sec. 39-3-1204,[3] regarding trespass on school grounds. Frost remained in jail for about three hours.
 
 
 9
 Frost's arrest received widespread local and some national media attention. Upon her release from jail she gave several press interviews. On December 14, 1983, she removed Sarah and her other children from the Hawkins County Schools and placed them in a private Christian school (where they were in attendance at the time of this appeal).
 
 
 10
 On November 20, 1984, almost a year after her arrest, Frost filed the instant suit. In her complaint, Frost alleged that defendants restrained the expression of her ideas on the advisability of using the new reading texts, denied her the physical custody of her daughter without due process, suppressed her right to speak symbolically, falsely arrested her, falsely imprisoned her and maliciously prosecuted her. She sought compensatory damages, punitive damages and consequential damages of $100,000 against each defendant, and asked that the Board be enjoined from depriving her of custody of her children, from seeking to have her arrested while on school premises, and from conspiring and assisting in attempts to impose prior restraint on expression of her criticism of the Board and its policies. In essence, Frost claimed she was denied her first and fourteenth amendment rights. Defendants Hawkins County Board of Education and the City of Church Hill denied all liability, and the individual defendants claimed good faith immunity.
 
 
 11
 Frost set out her claims in a pre-trial order entered July 12, 1985. On July 24, 1985, she requested to amend the order to add claims for libel, slander, and defamation. The district court correctly declined to exercise pendent jurisdiction over those state claims because Frost delayed in asserting them and because the district court believed that their inclusion would confuse the jury and unnecessarily complicate and prolong the action.
 
 
 12
 At various other times, Frost tried to amend the pre-trial order, move for a continuance or for a mistrial. All attempts failed and the case went to trial. When the evidence was completed, the court directed a verdict for the City of Church Hill and dismissed the punitive damages claim against the Board. At that time, Frost's final motion for mistrial before the district court was denied. The remaining defendants were the Board, Snodgrass, Ashbrook and Price.
 
 
 13
 The jury received the case on March 27, 1985. It returned a verdict that Frost's civil rights were violated and that she was entitled to punitive damages of $10,000 against Snodgrass and $10,000 against Price. The jury also found that Frost was entitled to $50,000 in compensatory damages from the Board. The court then told the jury that its verdict was inconsistent since punitive damages could not be awarded against a defendant without first awarding compensatory damages. After further deliberation, the jury awarded $70,000 in compensatory damages against the Board alone. This became the district court's judgment.
 
 
 14
 The Board then sought a judgment notwithstanding the verdict, a new trial, or a remittitur. Frost, for her part, filed several post-trial motions seeking an additur, injunctive relief, judgments notwithstanding the verdicts and/or new trials as to defendants Price, Ashbrook and Snodgrass. She also sought a new trial against the City of Church Hill.
 
 
 15
 These motions, which the trial court denied, are now the issues on appeal.
 
 II.
 
 16
 In evaluating whether the district court erred in denying the Board's motion for judgment notwithstanding the verdict and whether the district court properly directed the verdict in favor of the City of Church Hill, our standard of review is whether there was sufficient evidence to raise a material question of fact for the jury. O'Neill v. Kiledjian 511 F.2d 511, 513 (6th Cir.1975). This determination is one of law to be made by the trial court initially. Id.
 
 
 17
 In determining whether the evidence is sufficient, the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury. Rather, the evidence must be viewed in the light most favorable to the party against whom the motion is made, drawing from that evidence all reasonable inferences in his favor. If, after thus viewing the evidence, the trial court is of the opinion that it points so strongly in favor of the movant that reasonable minds could not come to a different conclusion, then the motion should be granted.
 
 
 18
 Morelock v. NCR Corp., 586 F.2d 1096, 1104-05 (6th Cir.1978), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979) (citations omitted). As an appellate court we apply the same standard. Id.
 
 III.
 
 19
 The dispositive issue in this case, as in any section 1983 case, is whether Frost was deprived of any federal right. In assessing this, we look to section 1983, on which all of plaintiff's claims are based. Section 1983, in relevant part, provides as follows:
 
 
 20
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 21
 42 U.S.C. Sec. 1983 (1982).
 
 
 22
 We think Frost's claims that she was deprived of her freedom to express her opposition to the Board's policy and that she was deprived of the custody of her child without due process are without merit. There is no evidence that the Board prevented Frost from voicing her opposition to the Board's policy at School Board meetings, or to the media or to whomsoever Frost pleased. For example, Frost was never ejected or barred from Board meetings, and the Board never retaliated against her for her outspoken criticisms of it. Frost's claim that she was deprived of the custody of her child without due process is equally unsupported. Frost had been given notice on November 22, 1983, that she would no longer be permitted to remove Sarah from the regular reading class. Despite this knowledge, and her unencumbered freedom to transfer Sarah to a private school (an option which Frost exercised on December 14, 1983), Frost chose to send her daughter back to Church Hill Elementary School and renew her disruption of the school's normal routine. For these reasons, we hold that the district court erred in refusing to grant the Board's motion for judgment notwithstanding the verdict. We come to this conclusion after viewing the evidence in the light most favorable to Frost, and giving her the benefit of all reasonable inferences. The evidence, nevertheless, points so strongly in favor of the Board that we think reasonable minds could not come to a different conclusion.
 
 
 23
 Pursuant to the same standard of review, we evaluate the district court's directed verdict in favor of the City. The basis of Frost's claims against the City is that Ashbrook arrested Frost without probable cause. The jury decided that Ashbrook, by arresting Frost, did not violate Frost's constitutional rights, thereby implicitly suggesting that Ashbrook had probable cause to arrest Frost. Since a jury's findings that a police officer inflicted no constitutional injury on a plaintiff is conclusive not only as to the officer's liability, but also as to the liability of the city and its police commission, City of Los Angeles v. Heller, 475 U.S. 796, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986), we affirm the district court's directed verdict in favor of the City of Church Hill. While Frost may have a state claim against Ashbrook based on her arrest, this is a question of state law and we express no opinion as to its validity.
 
 
 24
 Finally, we address Frost's claims against defendants Ashbrook, Price and Snodgrass. Frost sues these defendants in both their official and personal capacities.[4] In Brandon v. Holt, 469 U.S. 464, 471, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985), the Court notes that official capacity claims are essentially claims against the entity itself. Thus, our basis for rejecting Frost's claims against the Board and the City--i.e., because Frost suffered no constitutional deprivation--also forms the basis of our rejection of Frost's claims against Ashbrook, Price and Snodgrass in their official capacities. See e.g. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Similarly, we find that Frost's personal capacity claims against these defendants fail because Frost suffered no constitutional deprivation. Accordingly, we do not disturb the jury's verdicts as to these defendants.
 
 IV.
 
 25
 Since we have decided that Frost suffered no constitutional deprivation, her claims under section 1983 cannot succeed. However, even if Frost had suffered a constitutional deprivation, her section 1983 claim against the City, the Board and defendants in their official capacities would, nevertheless, fail because the alleged deprivations were not proximately caused by a custom or policy of the City or the Board. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).
 
 
 26
 Under Monell, local government entities, such as municipalities and school boards, are liable for civil rights violations if those violations result from the implementation of their official policy or are due to a governmental "custom." Municipal liability can be found for constitutional deprivations due to governmental "custom" even though that custom has not received formal approval through the government's official decision-making channels.[5] Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36. In the instant case, we find no evidence of an offensive custom. Accordingly, in order for Frost to recover on her claim, her supposed constitutional deprivation must have been proximately caused by an official policy of either the City or the Board.
 
 
 27
 The Supreme Court has defined policy. In Pembaur v. City of Cincinnati, 475 U.S. 469, 480-81, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986), the Court said official policy "often refers to formal rules or understandings--often but not always committed to writing--that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." Most recently in City of St. Louis v. Praprotnik, --- U.S. ----, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Court revisited this issue and in restating Pembaur's guiding principles stated:
 
 
 28
 First, a majority of the Court [in Pembaur ] agreed that municipalities may be held liable under Sec. 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to Sec. 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.
 
 
 29
 Praprotnik, 108 S.Ct. at 924 (citations omitted) (emphasis in original).
 
 
 30
 In light of these principles, we evaluate the only relevant policy in the record (with regard to the Board) i.e., the Board's November 10, 1983 resolution which required all Hawkins County students to use only those textbooks which the Board had currently approved. A review of the Board's policy along with a review of the way it was promulgated and implemented, reveals no evidence that this policy was a proximate cause of any of Frost's claimed deprivations. Additionally, we think the Board's policy was in pursuance of a legitimate Board interest: the uniform instruction of Hawkins County's 8,000 students. And of course, this very policy was upheld against constitutional attack in Mozert.
 
 
 31
 With regard to Frost's claim against the City, even if Frost's arrest had constituted a constitutional deprivation, we would not hold the violation to be pursuant to an official policy of the City. While we recognize that the Court in Pembaur held that municipal liability can be established on the basis of a single decision of one of its employees, we do not think that this is the case here. As the Pembaur court stated:
 
 
 32
 Municipal liability attaches only where the decision-maker possesses final authority to establish municipal policy with respect to the action ordered. The fact that a particular official--even a policy-making official--has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion.
 
 
 33
 Pembaur, 106 S.Ct. at 1299 (footnotes omitted). Because there is no evidence that Ashbrook possessed any final authority to establish municipal policy, Frost fails to meet this standard. The record establishes that in the City of Church Hill only the Mayor and the Board of Aldermen could determine Police Department policy. In fact, an examination of the trial testimony of the Mayor and the City Clerk, as well as the City's official minutes, makes it very difficult to see how the City participated in the incident that precipitated this lawsuit.
 
 
 34
 As for Frost's personal capacity suits against Ashbrook, Price and Snodgrass, we believe that even if a federal right had been violated, defendants would have had available to them the defense of qualified immunity.[6] In Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court held that, in general, executive officials are entitled to qualified or good-faith immunity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known. Id. at 815-19, 102 S.Ct. at 2736-39. Neither Snodgrass nor Price, by enforcing Board policy, nor Ashbrook, by arresting Frost, violated any clearly established statutory or constitutional right of which a reasonable person should have known. See Harlow, 457 U.S. at 815, 102 S.Ct. at 2736.
 
 
 35
 For the above stated reasons, we AFFIRM the district court's grant of a directed verdict in favor of the City of Church Hill, REVERSE the district court's judgment against the Board and grant a judgment notwithstanding the verdict in favor of the Board. Because the nonexistence of a federal violation is dispositive of the issues before the court, we find it unnecessary to discuss Frost's post-trial motions for additur, injunctive relief, and a new trial as to defendants Price, Ashbrook, Snodgrass and the City of Church Hill.
 
 
 
 [1]
 Pursuant to Tenn.Code Ann. Sec. 49-6-2207 (1983) ("T.C.A."), the books were approved by Tennessee's textbook commission and selected by a committee of Hawkins County teachers for use in grades kindergarten through eight. In relevant part, the statute states the following:
 (a) The local boards of education are hereby authorized and required to adopt textbooks to be used in the public schools of their school districts, from the list of textbooks listed for adoption by the state textbook commission, the adoption to be for a period of not less than three (3) years, and not more than five (5) years, in accordance with state contracts.
 ....
 (c)(1) Boards of education shall make their adoption upon recommendations of committees, these committees to be set up by subject matter fields and composed of three (3) or five (5) teachers, or supervisors and teachers, the number depending upon the relative size of the local school system.
 (2) These committees shall be composed of teachers and supervisors who are now teaching or supervising the respective subject and shall be by grade or groups of grades arranged so that a committee may consider an entire series of books if it should so desire, provided in all cases, that the teachers appointed on the committees herein provided for shall hold professional certificates and shall have had three (3) or more years of experience as teachers or supervisors in the public schools.
 
 
 [2]
 T.C.A. 49-6-2008 (1983), Persons improperly on school premises, provides as follows:--(a) In order to maintain the conditions and atmosphere suitable for learning, no person shall enter onto the grounds or into the buildings of public schools during the hours of student instruction except students assigned to that school, the staff of the school, parents of students, and other persons with lawful and valid business on the school premises
 (b) Any person improperly on the premises of a school shall depart on the request of the school principal or other authorized person.
 (c) Violation of this section shall be a misdemeanor and punished as such. [Acts 1981, ch. 386, Sec. 1; T.C.A., Sec. 49-818.]
 
 
 [3]
 T.C.A. 39-3-1204 (1983), Trespass on campus, buildings or facilities of school or university, provides as follows:--(a) Any person who enters the campus, buildings, or facilities of a junior college, state university, or public school and is committing, or commits, any act which interferes with, or tends to interfere with, the normal, orderly, peaceful, or efficient conduct of the activities of such campus or facility may be directed by the chief administrative officer, or employee designated by him to maintain order on such campus or facility, to leave such campus, buildings, or facilities
 (b) If such person fails to do so, he shall be guilty of trespass, and upon conviction shall be deemed guilty of, and punished as for, a misdemeanor as provided in Sec. 39-1202. [Acts 1969, ch. 257, Sec. 1; T.C.A., Sec. 39-1215.]
 In Baxter v. Ellington, 318 F.Supp. 1079 (E.D.Tenn.1970), the court held that T.C.A. 39-3-1204 was invalid because its language was vague and overbroad.
 
 
 [4]
 Personal capacity actions (which are sometimes referred to as individual-capacity actions) and official capacity actions are both permissible under section 1983. Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)
 
 
 [5]
 As Mr. Justice Harlan, writing for the Court, said in Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S.Ct. 1598, 1613-14, 26 L.Ed.2d 142 (1970): "Congress included customs and usages [in Sec. 1983] because of the persistent and widespread discriminatory practices of state officials ... Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."
 
 
 [6]
 To defeat official capacity claims, the defenses available are only those "immunities [which] ... are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment." Kentucky v. Graham, 473 U.S. at 167, 105 S.Ct. at 3106