Floyd SIMMONS, Yvonne Simmons,
Pamela Simmons, Cheryl Simmons,
Judy Evans, Plaintiffs,

v.

The CHEMUNG COUNTY DEPART-
MENT OF SOCIAL SERVICES, Lisa
Cocco–Robbins, Linda Lincoln, Karen
Carlyle, Donna Guinane, All Individu-
ally and as employees of the Chemung
County Department of Social Services,
William Meade, Kathy Butler–Dinova,
Both Individually and as employees of
the N.Y.S. Department of Social Servic-
es, and Craig Banfield, Individually and
as an Officer of the Village of Horse-
heads Police Department, Defendants.

No. CIV–90–560T.

United States District Court,
W.D. New York.

April 1, 1991.

Raymond J. Urbanski, Elmira, N.Y., for plaintiffs.

John F. O'Mara, Davidson & O'Mara, P.C., Elmira, N.Y., for Chemung Cty., Cocco-Robbins, Smith, Lincoln, Carlyle, Guinane.

Carlos Rodriguez, Asst. Atty. Gen., Rochester, N.Y., for Meade, Butler-Dinova.

James F. Young, Sayles, Evans, Brayton, Palmer & Tifft, Elmira, N.Y., for Craig Banfield.

## DECISION AND ORDER

TELESCA, Chief Judge.

Plaintiffs Judy Evans and Floyd, Yvonne, Pamela, and Cheryl Simmons commenced this action pursuant to 42 U.S.C. § 1983, alleging that the Chemung County Department of Social Services and five of its employees violated their constitutional rights to due process during the course of their investigation into allegations of possible sexual abuse at the Victory Life Day Care Center ("Victory Life"). The defendants now move for an order of summary judgment dismissing plaintiffs' complaint on the grounds of qualified immunity, failure to state a cause of action, failure to exhaust administrative remedies, and collateral estoppel. For the reasons discussed below, the defendants' motions for summary judgment are granted.

## BACKGROUND

During the period from September of 1984 until August of 1987, plaintiffs Reverend Floyd and Yvonne Simmons owned and operated Victory Life, a not for profit day care center located in the Victory Life Church in Horseheads, New York. Prior to August of 1987, Victory Life was licensed as a day care center by the New York State Department of Social Services (New York State DSS) and had as its employees, plaintiffs Pamela Simmons, Cheryl Simmons and Judy Evans.

Sometime in May of 1987, plaintiff were notified by the State Department of Social Services that their license would expire on August 31, 1987. Defendant William Meade, who was then responsible for licensing day care centers in Chemung County, thereafter began conducting a review of Victory Life for the purpose of establishing their right to a renewal permit. Pursuant to that investigation, Meade received a Memorandum report from Chemung County Department of Social Services ("Chemung DSS") on June 8, 1987 which expressed concern over recent allegations of child abuse and neglect at Victory Life. Defendants' Statement of Material Facts Not in Dispute, at ¶ 10.

Shortly thereafter, on August 4, 1987, the Chemung DSS received a hotline report from defendant R. Craig Banfield of the Horseheads Police Department concerning allegations of possible sexual abuse of children currently attending Victory Life. (I intentionally avoid indicating the identity of the parents and the children involved although they are well known to the parties.)

On August 5, 1987, members of the Chemung DSS Child Protective Services Investigative Unit ("Chemung DSS CPSU"), the Horseheads Police Department and members of the New York State DSS commenced an investigation into the merits of these allegations. At an initial meeting of Chemung County DSS personnel assigned to the case, defendant Linda Lincoln informed defendants Nancy Smith and Lisa Cocco–Robbins that she had investigated a previously reported incident of child abuse at Victory Life in 1986. Although that investigation proved to be unfounded, Lincoln advised the defendants that she still had reservations regarding the appropriateness of child care at Victory Life. Complaint, at ¶¶ 40–41.

The defendants thereafter conducted a series of interviews of parents and young children who were either attending or had previously attended Victory Life. Defendant Nancy Smith, then acting Director of the Chemung County DSS, assigned primary responsibility for this phase of the investigation to defendant Cocco–Robbins,

then a Senior Caseworker for the Chemung County DSS CPSU. Her immediate supervisor was defendant Donna Guinane. Aiding Cocco–Robbins in the interviewing process were defendants Lincoln, Karen Carlyle, a Senior caseworker, and Horseheads police officer Banfield.

In their complaint, plaintiffs allege that these defendants unreasonably conducted their investigation by using inappropriate means to obtain evidence and by intentionally distorting or falsifying the evidence obtained to ensure that plaintiffs' operating license would be revoked. In support of these claims, plaintiffs set forth a battery of allegations, most of which state, in substance, that the defendants permitted parents rather than caseworkers to interview their children,[1] subsequently failed to verify the information obtained from these parents,[2] and, in many instances, manipulated the evidence where it was inconclusive so that it would conform to their predetermined views regarding plaintiffs' culpability.[3]

As a result of the allegedly inaccurate information obtained from these interviews,[4] Floyd Simmons was served with a closure letter from the State Department of Social Services on August 10, 1987. That letter, which was drafted by defendant Meade, informed him that the State Department had determined that the children in the Victory Life day care center "may be in imminent danger," and that pursuant to § 390, subd. 11 of the Social Services Law,[5] the center's permit was temporarily suspended until further notice as of August 11, 1987. Subsequent interviews with other children at Victory Life were conducted which allegedly provided little corroborative evidence of sexually abusive behavior by the defendants. Complaint at ¶¶ 75–81.

On August 14, 1987, the plaintiffs requested a hearing to review the State De-

partment's decision, and, by letter dated September 17, 1987, were advised that such a hearing would be held on September 24, 1987. That letter also advised plaintiffs that the suspension was based upon information indicating that Cheryl and Yvonne Simmons had sexually abused children who attended Victory Life.

At the administrative hearing, both parties appeared with counsel and were allowed to present evidence on their behalf. At the hearing's conclusion, the ALJ found that the State Department of Social Services correctly suspended the plaintiffs' license "on the basis of substantial evidence of sexual abuse committed by the staff at the center." He further found that there was "ample evidence that many young people entrusted to the appellant [Simmons] had been repeatedly subjected to sexual abuse while at the appellants' center." *In the Matter of the Appeal of Reverend Floyd Simmons and Yvonne Simmons* (*see* Affidavit of Yvonne Simmons dated Dec. 12, 1990, Exhibit C). The ALJ's decision and determination were not appealed.

The investigation by the CPSU and Banfield continued until March 10, 1988. As a result of the investigation, "indicated" reports of child abuse concerning eighteen children were filed implicating each of the plaintiffs. An indicated report is one made after an investigation which has found "some credible evidence of the alleges abuse or maltreatment." 18 N.Y.C.R.R. § 432.1(g). At the plaintiffs request, an expungement hearing was held on May 27, 1988 with respect to these reports. *See* N.Y.Soc.Serv.Law § 422. The review panel, of which defendant Kathy Butler–DiNova was a part, denied plaintiffs' request and additionally decided that "indicated" reports should be filed for several other children at Victory Life. The plaintiffs later sought and received a hearing to deter-

1. *See, e.g.,* Complaint, at ¶¶ 65–66, 70.

2. *See, e.g.,* ¶ 107.

3. *See, e.g.,* ¶¶ 70–71, 87–88.

4. Plaintiffs allege that defendant Nancy Smith misrepresented the results of the interviews to the New York Department of Social Services by

informing it that several children had either implicitly or explicitly confirmed the child's story. Complaint at ¶ 70–71.

5. N.Y. Soc. Serv. Law § 390, subd. 11 (1987) (McKinney 1983).

mine whether the reports were supported by credible evidence. In a decision dated February 28, 1991, an ALJ determined that there was "no credible evidence that any of the 24 children were abused or maltreated by any of the ... plaintiffs" and that each of the indicated reports should accordingly be expunged. *In the Matter of the Appeal of Reverend Floyd Simmons, et al.,* at 6.

Plaintiffs now allege five causes of action in their complaint. In Count I, plaintiffs allege that defendant Meade violated their due process rights under New York state law (1) by failing to provide adequate and timely notice of the charges against them, (2) by failing to conduct his own investigation into the allegations of child abuse, (3) by unjustifiably concluding that the children at Victory Life might be in "imminent danger," and (4) by testifying falsely at the September 24, 1987 license revocation hearing.

In Count II, plaintiffs allege that defendant Kathy Butler–Dinova failed to carry out her responsibilities in conducting the expungement review process in a reasonably objective manner.

In Count III, plaintiffs similarly allege that defendants Nancy Smith and Donna Guinane negligently and in an objectively unreasonable manner failed to carry out their responsibilities in coordinating the investigation in question.

In Count IV, plaintiffs allege that defendant Chemung County Department of Social Services failed to properly train its employees.

In Count V, plaintiffs allege that defendants Banfield, Carlyle, Lincoln and Cocco–Robbins negligently and in an objectively unreasonably manner failed to carry out their responsibilities in conducting the investigation of the charges in question.

## DISCUSSION

Rule 56 of the Federal Rules of Civil Procedure allows a trial court to grant summary judgment if there exists no genuine issue of material fact and the moving party is entitled to summary judgment as a matter of law. In deciding a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought. *Matsushita Electric Ind. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Whether there are ultimately material issues of fact in dispute is determined by the substantive law governing the issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 243, 106 S.Ct. 2505, 2507, 91 L.Ed.2d 202 (1986). Keeping these principles in mind, I turn now to the various arguments of the defendants in support of their motion for summary judgment.

### 1. *Plaintiffs' Procedural Due Process Claims*

The defendants argue initially that the plaintiffs have failed to exhaust their administrative remedies and are therefore precluded from bringing this § 1983 action. While I agree with the defendants that the plaintiffs are precluded from bringing their § 1983 procedural due process claims, I do so for reasons other than those stated in defendants' brief.[6]

### a. Parratt/Hudson/Zinermon Rule

In its recent decision in *Zinermon v. Burch,* 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), the Supreme Court was faced with a § 1983 procedural due process claim brought by a former "voluntary" patient of a Florida state mental hospital. The plaintiff in that case alleged that physicians and administrators of the mental facility violated state law by admitting him as a "voluntary" mental patient when they knew or should have known that he was incompetent to give his informed consent, and that their failure to initiate Florida's involuntary placement procedure denied

---

**6.** In treating these claims, I assume, without deciding, that plaintiffs have alleged a sufficient interest to invoke due process protections.

him constitutionally guaranteed procedural safeguards. The lower courts dismissed plaintiff's claim, relying on *Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) and *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), which held that a deprivation of a constitutionally protected property interest caused by a state employee's "random" and "unauthorized" conduct does not give rise to a § 1983 procedural due process claim unless the state fails to provide a post deprivation remedy. The Supreme Court in *Zinermon*, however, reversed, holding that the plaintiff's complaint was sufficient to state a procedural due process claim under § 1983. In doing so and of significance to this case, the Court attempted to set forth the rules which govern the relationship between the availability of state remedies and all § 1983 due process claims.

The principal rule, and the most straightforward, is that a plaintiff generally need not exhaust his or her state administrative remedies before commencing an action under section 1983. *Id.* 110 S.Ct. at 982–83; *see also Patsy v. Board of Regents of the State of Fla.*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). As the Court noted:

'It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked.'

*Zinermon*, 110 S.Ct. at 982 (quoting *Monroe v. Pape*, 365 U.S. 167, 183, 81 S.Ct. 473, 482, 5 L.Ed.2d 492 (1961)). Thus, "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." *Id.*

■ The rule is inapplicable and exception exists, however, where, as here, the plaintiffs allege claims based on violations of *procedural* due process. For these claims, the existence of state remedies *is* relevant because the constitutional viola-

tion actionable under § 1983—the deprivation of a protected interest *without due process of law*—does not occur "until and unless the State fails to provide due process." *Id.* To determine whether a constitutional violation has occurred in these cases, "it is [therefore] necessary to ask what process the State provided, and whether it was constitutionally adequate." *Id.*

In most cases, the State must provide some kind of hearing *before* it deprives a person of liberty or property. *Id.* at 984. The courts have waived this requirement, however, where such predeprivation process would be "impracticable" or where the State must necessarily act quickly. In these cases, the courts have "held that a statutory provision for a postdeprivation hearing, or a common law tort remedy for erroneous deprivation, satisfies due process." *Id.*

As the *Zinermon* court noted, this is where rule of *Parratt v. Taylor*[7] and *Hudson v. Palmer*[8] "comes into play." In both of *Parratt* and *Hudson*, an employee of the state unforeseeably and without authorization from the state, transgressed established procedures and, in the process, caused a deprivation of a prisoner's protected due process right. The Court held in each instance that, under such circumstances, the plaintiffs were entitled to only post deprivation tort remedies because those were the only remedies which the State could reasonably be expected to provide. *Parratt*, 101 S.Ct. at 1916; *Hudson*, 104 S.Ct. at 3203. The Court concluded in both cases that as long as those remedies were adequate, the plaintiffs were being afforded all the process that was due them and therefore could not allege an actionable claim under § 1983.

■ Although pledging its allegiance to the rule developed in *Parratt* and *Hudson*, the Court in *Zinermon* reformulated it as such: "[W]hether ... the *Parratt* rule necessarily precludes § 1983 liability ... [de-

**7.** 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).

**8.** 468 U.S. 517, 104 S.Ct. 3194, 3203, 82 L.Ed.2d 393 (1984).

pends on] whether [the State could implement] predeprivation procedural safeguards ... to address the risk of deprivations of the kind" the plaintiff alleges. 110 S.Ct. at 987. According to the Court, the factors to be considered in making this determination are: (1) the extent to which the State can foresee the risk, *id.* at 987, 990, (2) the degree to which it can reduce that risk through additional predeprivation process or by limiting the defendants discretion in implementing already established procedures, *id.* at 988–89, and (3) the degree to which the defendants have the power and authority to implement the procedural safeguards required before the deprivation may occur, *id.* at 990 [9]; *see also Easter House v. Felder*, 910 F.2d 1387, 1399 (7th Cir.1990) (en banc) (concern in this area is "whether the risk of deprivation is such that the state could predict when a deprivation might occur and, more importantly, protect against such an occurrence through the implementation of additional predeprivation process").

■ Applying these factors to the record in this case, it is clear that State could not have implemented additional predeprivation safeguards to address the risk of the kind of procedural violations alleged to have occurred here. First, unlike the situation in *Zinermon*, there is no one "specific, predictable point" where such deprivations would necessarily occur. The plaintiffs allege simply that the defendants failed to follow well-delineated procedures during the course of their investigation and in processing their requests for a hearing and expungement.

Second, there is no additional pre-deprivation process which the State could have provided to eliminate the risk of deprivation or further curtail the defendants' discretion. Again, this is not like the statute at issue in *Zinermon*. In that case, the Court was faced with a state statute which gave the defendants broadly delegated authority to effect the deprivation at issue but which did not provide for effective pre-

deprivation safeguards. "It was in view of this statutory oversight that the Court concluded that the deprivation which occurred was 'predictable' and, as such, not 'random.'" *See Easter House*, 910 F.2d at 1401.

Here, the New York statutory and regulatory schemes do not raise the same concerns nor do I understand the plaintiffs as arguing such. While the defendants did exercise a certain amount of discretion and authority over the both the expungement and licensing processes, that discretion was neither "uncircumscribed" nor otherwise unregulated. *See* N.Y. Soc. Serv. Law §§ 390, *et seq.*; 18 N.Y.C.R.R. §§ 418, *et seq.*; *cf. Easter House*, 910 F.2d at 1401. The State, therefore, could not have predicted or prevented the defendants alleged transgressions of those established procedures which they were statutorily required to follow. As the Second Circuit recently noted in an analogous situation, "a State rule directing persons in the [defendants'] position to hold a hearing before violating ... [such] rule[s] or regulation[s] would be senseless." *Katz v. Klehammer*, 902 F.2d 204, 207 n. 1 (2d Cir.1990).

In sum, this case presents the special instance of due process case where "no predeprivation safeguards would be of use in preventing kind of deprivation[s] alleged." *Zinermon*, 110 S.Ct. at 991.

b. Adequacy of State Law Remedies

Article 78 of the New York Civil Practice Law and Rules and procedural safeguards of the New York Social Services Law provide adequate remedies for plaintiffs' claims. N.Y. C.P.L. & R. § 7801 (McKinney 1981); N.Y. Soc. Serv. Law § 422. Plaintiffs may bring an Article 78 proceeding to enforce state law where "the body or officer failed to perform a duty enjoined upon it by law" or where "the body or officer proceeded, is proceeding or is about to proceed without or in excess of his jurisdiction." *Id.* at § 7803. To the extent that the Social Services Law and accompanying

---

**9.** The Court in *Zinermon* also made explicit what was implicit in *Parratt* and *Hudson*—that the nature of the protected due process interest,

whether a liberty or property interest, is irrelevant to this analysis. *Id.* 110 S.Ct. at 986.

regulations compelled the defendants to perform certain acts, Article 78 may thus serve to enforce such requirements when officials fail to fulfill these obligations. *Katz,* 902 F.2d at 207.

Furthermore, the plaintiffs had available and did obtain administrative review of the defendants denial of their expungement request. *See* N.Y. Soc. Serv. Law § 422. Such a hearing constitutes all the process due the plaintiffs. Accordingly, the defendants' motion for an order of summary judgment dismissing plaintiffs' procedural due process claims is granted.

### 2. *Plaintiffs' Remaining Due Process Claims*

Plaintiffs remaining due process claims against the individual defendants are not procedural in nature but instead allege what can fairly be characterized as substantive due process claims for baseless or malicious prosecution. *Cf. Raysor v. Port Authority of N.Y. & N.J.,* 768 F.2d 34 at 39–40 (2d Cir.1985), *cert. denied,* 475 U.S. 1027, 106 S.Ct. 1227, 89 L.Ed.2d 337; *Singleton v. City of New York,* 632 F.2d 185, 195 (2d Cir.1980); *Kompare v. Stein,* 801 F.2d 883, 891 n. 9 (7th Cir.1986) (claim of malicious prosecution is predicated on due process notions that one has a right to be free from prosecution except for probable cause). As such, they are not subject to the rule developed in *Parratt.*

■ To succeed on a claim of malicious prosecution, the plaintiffs must show (1) the defendants' commencement or continuation of a proceeding against them, (2) the termination of the proceeding in their favor, (3) the absence of probable cause for the proceeding and (4) actual malice. *Broughton v. State of N.Y.,* 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 335 N.E.2d 310, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975).

■ It is clear from the undisputed facts that the plaintiffs cannot satisfy two of the necessary four elements of their claim. First, the license revocation process did not ultimately terminate in the plaintiffs' favor, if for no other reason than they failed to appeal the ALJ's decision. Second, the plaintiffs' have failed to raise a triable issue of fact rebutting the ALJ's finding of probable cause for the initial suspension. Drawing upon the established law of malicious prosecution cases, it is well settled that a presumption of probable cause arises where the evidence gathered by investigators is subsequently found by a neutral arbiter to justify the challenged state action. *Cf. Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983); *Gisondi v. Town of Harrison,* 72 N.Y.2d 280, 284, 532 N.Y.S.2d 234, 528 N.E.2d 157 (1988); *Broughton,* 37 N.Y.2d at 458, 373 N.Y.S.2d 87, 335 N.E.2d 310. The plaintiffs may overcome this presumption only by establishing that the arbiter's finding was procured through fraud, perjury, the suppression of evidence or other conduct undertaken in bad faith. *Colon v. City of New York,* 60 N.Y.2d 78, 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (1983). It is not enough for the plaintiff to show that the state investigators could have done more or could have disclosed more. *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); *Gisondi,* 72 N.Y.2d at 285, 532 N.Y.S.2d 234, 528 N.E.2d 157. Instead, the plaintiffs must demonstrate that the defendants deviated egregiously from accepted practices of investigation or otherwise engaged in conduct that "shocks the conscience." *See, e.g., McCollan,* 99 S.Ct. at 2696 (Blackmun, J., concurring) (possible due process violation where police officer deliberately and repeatedly refused to check the identity of complaining prisoner against readily available mug shots and fingerprints); *Kompare,* 801 F.2d at 892; *Gisondi,* 72 N.Y.2d at 285, 532 N.Y.S.2d 234, 528 N.E.2d 157 (police required only to disclose discrepancies in the evidence which would clearly exonerate the suspect).

Even construing the record in a light most favorable to the plaintiffs, I cannot say a reasonable trier of fact could find that defendants investigative techniques amounted to such egregious conduct. The plaintiffs allege that the defendants asked leading questions, inaccurately recorded information, drew inappropriate inferences,

and generally presented a misleading view of the evidence they collected. While I agree that such methods are far from ideal, allegations of child abuse often require investigators to make difficult determinations concerning a child's credibility, both in light of his impressions as well as those of the parents. The courts and the state recognize these problems and accordingly require the investigating authorities to substantiate their claims within a short period of time after the deprivation has occurred. At the time of the suspension, however, latitude must be given to investigators where, after a thorough inquiry, they find probable cause suggesting that even a *single* child has been abused. The fact that this determination might not withstand the scrutiny of a full blown evidentiary hearing does not mean that it lacked initial validity. As far as the instant case is concerned, the record contains sufficient evidence to support defendants' initial finding of probable cause. Even the ALJ who decided plaintiffs' expungement request conceded that "[The child's] ... initial statements in August of 1987 certainly justified a thorough investigation of VLDCC [Victory Life Day Care Center] and its staff as well as [a] temporary protective action pending further investigation."

Furthermore, aside from the decision of the ALJ after the expungement hearing, plaintiffs have failed to direct the court to any other evidence in the record even suggesting that defendants perjured themselves, acted in bad faith or otherwise engaged in conduct that shocks the conscience. *Cf.* Affidavit of R. Craig Banfield dated October 4, 1990. Although relatively early in the litigation, the plaintiffs have nonetheless failed to provide the court with *any* affidavits from parents or other persons interviewed during the course of the state's investigation which substantiate their allegations. It is by now axiomatic that parties who bear the burden the proof at trial may not defeat a motion for summary judgment simply by resting on the allegations made in their pleadings, no matter how substantial they may be. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53. Accordingly, the defendants mo-

tion for an order of summary judgment dismissing plaintiffs' claims of malicious prosecution is granted.

### 3. *Plaintiffs' "Failure to Train" Claim Against the Chemung County Department of Social Services*

In light of the above ruling finding probable cause for defendants' conduct, that portion of plaintiffs' claim against the County which rests upon allegations of malicious prosecution must be dismissed. As the Supreme Court recently stated, if the agent "inflicted no constitutional injury on [the plaintiffs], it is inconceivable that [the principal] could be liable" to them under § 1983. *City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (per curiam).

With respect to the remainder of plaintiffs' failure to train claim, I find that the complaint contains insufficient allegations to defeat defendants' summary judgment motion. I note only that the plaintiffs do not allege that the defendants have violated licensing or expungement procedures in the past nor do they "point to any facts outside ... [their] own case supporting ... [their] claims of a municipal policy or custom." *Soucie v. County of Monroe,* 736 F.Supp. 33, 38 (W.D.N.Y.1990) (Telesca, C.J.). Instead, they rely upon on only the violations allegedly committed in connection with the investigation of Victory Life, and most, if not all, of these involved actors below the policymaking level. "Such allegations will generally 'not suffice to raise an inference of the existence of a custom or policy, especially where they involve intentional ... misconduct of which the County had no prior notice.'" *Id.* at 38 (citation omitted). Accordingly, the plaintiffs' failure to train claim against the County is dismissed.

### SUMMARY

The plaintiffs have failed to allege an actionable claim of procedural due process under § 1983 and have otherwise failed to raise a triable issue of fact with respect to the reasonableness of the defendants' conduct. Accordingly, the defendants' motion

for an order of summary judgment dismissing plaintiffs' complaint is granted.

ALL OF THE ABOVE IS SO ORDERED.

