### Paul AMATO, Plaintiff,

v.

### CITY OF SARASOTA SPRINGS, Sarasota Springs Police Department, Sergeant Flanagan, Lt. Lynn Thomas, Police Chief Kenneth King, Commissioner Lewis J. Benton, III, Defendants.

### No. 95–CV–1510.

United States District Court, N.D. New York.

July 14, 1997.

**122**

Law Office of David Brickman, Albany, NY (David Brickman, of counsel), for Plaintiff.

Bohl, Della Rocca & Dorfman, P.C., Albany, NY (James B. Tuttle, of counsel), for Defendant Robert Flanagan.

Horigan, Horigan, Pennock & Lombardo, Amsterdam, NY (John H. Pennock, of counsel), for Defendant Kenneth King.

Dreyer Boyajian L.L.P., Albany, NY (Daniel J. Stewart, of counsel), for Defendant Lewis J. Benton, III.

Fitzgerald, Morris, Baker & Firth, P.C., Glens Falls, NY (Veronica Carrozza O'Dell, of counsel), for Defendants City of Saratoga Springs, Saratoga Springs Police Department and Lynn Thomas.

## MEMORANDUM, DECISION AND ORDER

McAVOY, Chief Judge.

This action arises out of **plaintiff Paul Amato's** arrest and booking at defendant **Saratoga Springs Police Department** ("the **Department**") on May 26, 1994. Plaintiff alleges that while he was being booked, **defendants Robert Flanagan and Lynn Thomas**[1] used excessive force on him, and then denied him medical treatment. Plaintiff's Second Amended Complaint, filed December 3, 1996, alleges that Flanagan and Thomas violated his rights to be free from the use of excessive force, deprived him of liberty without due process of law, and failed to provide him with adequate medical treatment.

Plaintiff additionally alleges that the Department, **defendants City of Saratoga Springs ("the City"), Kenneth King and Lewis J. Benton, III** maintain a custom or policy of, *inter alia,* failing to discipline officers involved in such incidents, failing to investigate such incidents, covering up such incidents, and failing to train its officers.

Plaintiff brings these claims against the defendants under 42 U.S.C. § 1983.

Four motions are now pending before the Court: (1) Flanagan's motion for bifurcation; (2) Benton's motion for summary judgment; (3) King's motion for summary judgment; and (4) plaintiff's cross-motion for leave to amend and for a declaratory judgment.

## I. BACKGROUND

### A. Facts

Plaintiff was arrested by Flanagan and other officers of the Department on May 26, 1994, in connection with an incident that occurred at Pope's Pizza, a restaurant in Saratoga Springs, New York. (Benton Rule 7.1(f) Stat. at 4; Affidavit of Daniel J. Stewart ["Stewart Aff."], Ex. H). Plaintiff was alleged to have been causing a disturbance at the restaurant, and was subsequently charged with disorderly conduct and taken to the police station for booking. (Stewart Aff. Ex. H).

Upon arriving at the police station, plaintiff was handcuffed to the booking counter, where Thomas began to book him. (Stewart Aff. Ex. H). Thomas claims that while he was looking through plaintiff's wallet for identification, plaintiff moved his hand in a manner that Thomas interpreted as an attempt to strike him. (Stewart Aff. Ex. H; Aff. of David Brickman ["Brickman Aff."] Ex. 2). Thomas thus asserts that he "instinctively" slapped plaintiff on the right side of his face with his left hand.[2] (Brickman Aff. Ex. 2).

Meanwhile, Flanagan was approaching the booking desk from another room. (Flanagan Dep. at 97). According to Flanagan, plaintiff was trying to stop Thomas from ascertaining plaintiff's identity. (*Id.* at 101). Spotting plaintiff's hand moving over the booking desk, and allegedly fearing that plaintiff was going to strike Thomas, Flanagan grabbed

---

1. On March 4, 1997, plaintiff, pursuant to Fed. R.Civ.P. 25(a)(1), suggested upon the record the death of defendant Lynn Thomas during the pendency of this action. By stipulation and order signed by the Court on June 2, 1997, Karen Thomas was appointed personal representative of defendant Lynn Thomas for the purposes of this action.

2. Plaintiff alleges that he reached for his wallet in an attempt to locate his license. (Pl. Dep. at 36).

plaintiff by the chin or neck [3] and pushed him back against the wall. Flanagan thereafter exchanged words with plaintiff, and eventually let him go. (Stewart Aff. Ex H). Plaintiff fell to the ground, allegedly unconscious, and arose a few minutes later. (*Id.;* 2d Am. Compl. ¶ 22). The booking apparently continued without incident. (Pl. Dep. at 41–42).[4]

At the time of the incident, and since April of 1969, defendant Kenneth King was the Chief of the Saratoga Springs Police Department. (King Dep. at 20–21). Defendant Lewis Benton was the City's Commissioner of Public Safety, and had been since January of 1988. (Benton Aff. ¶ 3). The Public Safety position is part-time only, and the Police Chief is directly responsible for the supervision and training of the police department. (Stewart Aff. Ex E at 4–5; Ex. E. at 6, 12; Ex. D at 7, 31). Neither Benton nor King was present during the incident involving plaintiff. (Benton Aff. ¶ 14; Pl. Response to Interrogatories ["Pl. Resp."] at 12–16).

Subsequent to the incident, plaintiff did not file a personnel complaint with the Department. (King Dep. at 63–67). In late June of 1994, however, plaintiff's criminal defense attorney requested a copy of a booking area videotape that contained the contents of the incident. (King Dep. at 63; Stewart Aff. Ex. J). As a result, King commenced an investigation of the matter. (*Id.*). As part of this investigation, King reviewed the reports of the individuals involved, spoke with the individuals, and required that further reports be filed. (*Id.* at 69–79). Specifically, King requested that each officer involved in the matter submit an "in-depth narrative report in the to/from format expanding on the incident which [he] observed on the tape[.]" (*Id.* at 70; *see* Brickman Aff. Ex. 2). Based upon such further reports and upon a review of the videotape, King concluded that no misconduct had occurred. (King Dep. at 70–73, 278).

## II. DISCUSSION

### A. Bifurcation

Flanagan argues that because of the difference between the type of claims asserted against he and Thomas on the one hand, and those asserted against the remaining defendants on the other, trial of the two sets of claims should be bifurcated. Under this scenario, plaintiff's claims against Flanagan and Thomas would be tried first. If either or both of those defendants are found liable, the Court would then proceed to try the so-called *Monell* claims against the remaining defendants.

Fed.R.Civ.P. 42(b) provides that

[t]he Court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues ...

The Court has broad discretion to order bifurcation to promote convenience, avoid prejudice to defendants, or to promote efficiency. *West v. City of New York,* 1996 WL 240161 (S.D.N.Y.1996); *Ismail v. Cohen,* 706 F.Supp. 243, 251 (S.D.N.Y.1989), *aff'd,* 899 F.2d 183 (2d Cir.1990). However, "[t]hese factors do not represent a rigid test for determining whether separate trials are necessary; to the contrary, the court could order bifurcation upon a showing of merely one of these factors." *Carson v. City of Syracuse,* 1993 WL 260676 at *2 (N.D.N.Y.1993) (McCurn, J.) (citing *Ricciuti v. New York City Transit Auth.,* 796 F.Supp. 84, 86 (S.D.N.Y.1992); *Ismail,* 706 F.Supp. at 251).

Flanagan first asserts that plaintiff intends to introduce at trial extensive proof on his *Monell* claim that would be inadmissible against he and Thomas, such as their personnel records and those of other officers, and a

---

**3.** Since the incident was captured on videotape, there is no dispute that Flanagan in fact grabbed the plaintiff. There is a significant dispute, however, as to whether Flanagan grabbed him by the chin or the throat. Flanagan claims to have grabbed plaintiff under the chin, and denies making contact with plaintiff's throat or trachea.

(Flanagan Dep. at 103, 108). Plaintiff claims that Flanagan choked him. (2d Am.Compl.¶ 22).

**4.** Plaintiff alleges in his Complaint, however, that after the incident, he was held in a holding cell for eighteen hours and was denied medical treatment. (2d Am.Compl.¶¶ 52–53).

history of all claims of excessive force brought against the Department. Admission of this evidence, Flanagan argues, would result in prejudicial spillover against the individual defendants. Judge McCurn found this argument convincing in *Carson*, noting first that such evidence clearly would be relevant to show the City's liability on a *Monell* theory, particularly in terms of its knowledge of its police officers' violent tendencies. *Carson*, 1993 WL 260676 at *3. The same evidence, however, would be prejudicial against the individual defendants, Judge McCurn reasoned, since the jury would be tempted to consider it as prior bad act evidence to show action in conformity therewith on the part of the officers. *Id.; see* F.R.E. 404(b). To resolve this conflict, Judge McCurn ordered bifurcation. *Id.* at *4.

■ Plaintiff himself asserts that discovery has revealed, *inter alia*, that Flanagan and other officers have a history of assaulting members of the public, and that lawsuits against Flanagan and others involving excessive force have been settled by the City. (Pl. Mem. in Opp. at 3–4). This Court agrees with Judge McCurn that the likelihood of unfair prejudice against the police officers resulting from the admission of such evidence on the *Monell* claim "would justify, if not compel, bifurcation[.]" *Carson*, 1993 WL 260676 at *4; *see also West v. City of New York*, 1996 WL 240161 at *5 (S.D.N.Y.) (bifurcation appropriate where plaintiff's *Monell* claims would "require extensive evidence concerning the City's policies on the use of force that [was] largely irrelevant to plaintiff's claims against the individual defendants.").

Concerns of efficiency additionally militate in favor of bifurcation. It is well-settled that a claim of negligent training or supervision under *Monell* lies against a municipality only where there is a finding of a constitutional violation by one of its officers. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986); *Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir.1994).

Thus, a no-cause verdict against the individual defendants would obviate the necessity of a trial on plaintiff's *Monell* claim. *See West*, 1996 WL 240161 at *5; *Ricciuti*, 796 F.Supp. at 85.

In opposing bifurcation, plaintiff argues conclusorily that "[m]uch of the evidence complained about by the Defendants will be admissible against Defendant Flanagan to prove habit, knowledge, intent, malice, etc." (Pl. Mem. in Opp. at 7). The Court flatly disagrees with the broad sweep of such a statement, and plaintiff has failed to explain how or why such evidence would be admissible for these purposes. In any event, ordering bifurcation does not amount to an *in limine* ruling that such evidence is inadmissible against the individual defendants for all purposes. Rather, the Court holds that to the extent that much of this evidence will likely be admissible only against the City defendants, it is likely to unfairly prejudice Flanagan and Thomas. If plaintiff maintains that particular evidence is relevant to prove any of the matters as to which prior act evidence is properly admissible under Rule 404(b), the Court can rule on such matters prior to or during trial.

The remainder of plaintiff's opposition consists of irrelevant citations to criminal cases dealing with severance, and a rather confusing argument on the issue of proximate cause.[5] These arguments also are unavailing. For the foregoing reasons, Flanagan's motion for bifurcation is granted, and the trial will proceed first with plaintiff's claims against defendants Flanagan and Thomas. If liability is found against either or both of these defendants, the Court will proceed with the *Monell* claims against the City defendants. In the interests of economy and efficiency, the trials will proceed "back-to-back" with the same jury. *See Carson*, 1993 WL 260676 at *7.

### B. Summary Judgment

The Court will now discuss Benton's and King's motions for summary judgment.

---

5. Plaintiff also argues that the efficiency argument is meritless because the alleged incident of excessive force was caught on videotape. Thus, plaintiff asserts, "defendants cannot seriously argue that a jury in this instance is unlikely to find excessive force." (Pl. Mem. in Opp. at 9). Since the Court cannot predict what the jury's finding will be, however, this argument is unavailing.

**1. The Standard for Summary Judgment.**

Under Fed.R.Civ.P. 56(c), if there is "no genuine issue as to any material fact ... the moving party is entitled to a judgment as a matter of law ... where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The burden to demonstrate that no genuine issue of material fact exists falls solely on the moving party, *Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317 (2d Cir.1975), and the trial court must resolve all ambiguities and draw all inferences in favor of that party against whom summary judgment is sought. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989); *Eastway Construction Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985) *cert. denied* 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

Once the moving party has met its burden, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 585–86, 106 S.Ct. at 1355–56. A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). The motion will not be defeated by a non-movant who raises merely a "metaphysical doubt" concerning the facts or who only offers conjecture or surmise. *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990), *cert. denied*, 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991) (quoting *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355–56).

It is with these considerations in mind that the Court addresses defendants' motion for summary judgment.

**2. Liability Under § 1983**

Benton moves for summary judgment dismissing plaintiff's § 1983 claim against him in his individual capacity. King moves for summary judgment dismissing plaintiff's § 1983 claim against him, but fails to specify whether he seeks dismissal against the individual or official capacity claims or both. Since all of the parties on this motion fail to emphasize this distinction, and since plaintiff blurs the distinction in his opposition, these matters merit a brief discussion.

The Supreme Court, in *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), explained the relevant differences between the two types of claims:

> Personal capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law. Official-capacity suits, in contrast, "generally represent only another way of pleading an action against an entity of which an officer is an agent." As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity.

*Id.* at 165–66, 105 S.Ct. at 3105 (emphasis in original) (internal citations omitted) (quoting *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978)). Based upon this distinction, district courts have gone as far as dismissing official-capacity claims against individuals as redundant or unnecessary where *Monell* claims were asserted against the entity. *See, e.g., Doe v. Rains Independent School District*, 865 F.Supp. 375, 378 (E.D.Tex.1994), *rev'd on other grounds*, 66 F.3d 1402 (5th Cir.1995); *Doe v. Douglas County School District*, 775 F.Supp. 1414, 1416 (D.Colo.1991).

The distinction is particularly relevant on the present motion because the standards of liability against an entity and an individual differ, as do the defenses that may be asserted. Official capacity suits require a showing that the municipality's policy or custom played a role in the violation of federal

law, whereas individual capacity suits require only that " 'the official, acting under color of state law, caused the deprivation of a federal right.' " *Hafer v. Melo,* 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991) (quoting *Graham* 473 U.S. at 166, 105 S.Ct. at 3105). Moreover, individuals sued in their official capacity are entitled only to those immunities that the municipality itself possesses, while personal capacity suits are subject to the defense of qualified immunity. *Id.*

Having made this distinction explicit, the Court addressees defendants' motions insofar as they attack plaintiff's personal-capacity § 1983 claims. The City has not joined in the motion, and thus any issues regarding a custom or policy of the municipality have not been briefed by the adverse party with the greatest stake in the resolution of such an issue. Moreover, by raising the defense of qualified immunity in their motions, Benton and King clearly intend to address the claims asserted against them in their individual capacities. Finally, insofar as claims are asserted against the individual defendants in their official capacities, the Court regards such claims as redundant in light of the claims asserted against the City. *Accord Rains Independent School District,* 865 F.Supp. at 378; *Douglas County School District,* 775 F.Supp. at 1416. Thus, the official-capacity claims against King and Benton are hereby dismissed.

With these considerations in mind, the Court turns to defendants' motions for summary judgment.

### 3. Defendants' Motions

#### a. Supervisory Liability Under § 1983

■ A defendant sued under § 1983 may not be held liable merely because he held a high position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Leonhard v. United States,* 633 F.2d 599, 621 n. 30 (2d Cir.1980), *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). Rather,

personal involvement in the constitutional violation on the official's part is required. *Black,* 76 F.3d at 74; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 886 (2d Cir.1991). The Second Circuit has construed "personal involvement" in the § 1983 context to mean either direct participation, failure to remedy a wrong after learning of it, creation of a policy or custom by the official under which unconstitutional practices occurred, or gross negligence in managing subordinates.[6] *Black,* 76 F.3d at 74; *Wright,* 21 F.3d at 501. A showing of mere negligence on the official's part will not suffice. *Moffitt,* 950 F.2d at 886 n. 5 (citing *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 663, 88 L.Ed.2d 662 (1986)); *Wise v. New York City Police Department,* 928 F.Supp. 355, 368 (S.D.N.Y. 1996).

#### b. Defendant Benton

Plaintiff concedes that nothing in the record indicates that Benton in any way participated in the acts complained of or ratified those acts. (Pl. Mem. in Opp. at 8). Plaintiff argues, however, that

> [g]iven the number of lawsuits filed against this relatively small department during the time that Defendant Benton was in office together with the fact that there were never investigations of allegations of misconduct where lawsuits were filed nor even any reference to the lawsuits contained in the personnel files of the accused officers, it is arguable that Defendant Benton ... is liable for gross negligence in maintaining the City's policy of settling lawsuits with no finding of wrongdoing.

(Pl. Mem. in Opp. at 8). In support of this argument, plaintiff submits a number of documents, including releases signed by individuals who brought lawsuits against the City. (*See* Brickman Aff. Ex. 5). Plaintiff additionally submits a number of documents evidencing both civilian and departmental complaints

---

**6.** "[G]iven the Supreme Court's decision in *City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), adopting the deliberate indifference standard for municipal liability· inadequate training claims, the circuit court's reference to 'gross negligence' likely is erroneous." MARTIN A. SCHWARTZ & JOHN E. KIRKLIN, SECTION 1983 LITIGATION: CLAIMS, DEFENSES AND ·FEES, § 7.11 at 36 (1996 Cum.Supp. No. 2).

regarding Flanagan's conduct in the past. (*Id.* Ex 1–4).

■ Plaintiff's submissions are insufficient to withstand Benton's motion for summary judgment. From January of 1988 until the time of the incident in May of 1994 (during which Benton was Public Safety Commissioner), no more than four lawsuits were filed alleging misconduct on the part of the police. (*See* Brickman Aff. Ex. 5). This is hardly sufficient to create an issue of fact as to any deliberate indifference on Benton's part in maintaining a policy of settling lawsuits with no finding of wrongdoing. *See, e.g., Lewis v. Meloni,* 949 F.Supp. 158, 164 (W.D.N.Y.1996) (no issue of fact created as to policy of deliberate indifference where plaintiff merely attached copies of seventeen claims made against Sheriff over five-year period); *Mendoza v. City of Rome,* 872 F.Supp. 1110, 1119 (N.D.N.Y.1994) ("the mere fact that Notices of Claims were filed does not constitute evidence of violation of Constitutional rights.").

Moreover, plaintiff has failed to point to anything in the record raising an issue of fact as to any knowledge on Benton's part of this or other incidents, coupled with a failure to act. *See Lewis,* 949 F.Supp. at 165. Benton was never shown the video, nor was he ever informed of the alleged misconduct captured therein. (Benton Aff. ¶ 14). Nor has plaintiff presented any evidence that Benton in any way supported or encouraged a "pattern of constitutional violations." *Washington Square Post No. 1212 v. City of New York,* 720 F.Supp. 337, 345–46 (S.D.N.Y.1989), *rev'd in part on other grounds,* 907 F.2d 1288 (2nd Cir.1990). In short, plaintiff has presented no evidence that would create an issue of fact as to Benton's supervisory liability.

For all of the foregoing reasons, Benton's motion for summary judgment is granted.

### c. Defendant King

Plaintiff raises no issue of fact as to his claim that King failed to properly train the officers under his control. King submits undisputed evidence that all police officers employed by the Department are trained in accordance with State requirements at the Zone 5 Police Academy of the Bureau of Municipal Police, New York State Division of Criminal Justice Services at the Hudson Valley Community College. (King Dep. at 11–20; 172–74). Additionally, new officers in the Department receive 1½ years of on the job training, along with in-service training on a regular basis. (*Id.*).

Moreover, while the Department's formal training policy is not conclusive as to whether it had an actual practice of inadequate training, *see City of Canton v. Harris,* 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989), plaintiff submits no evidence of any deliberate indifference on King's part with respect to training, nor of any practice implemented by King evidencing inadequate training.

Plaintiff focuses his opposition to the motion on allegations that King failed to supervise or discipline his officers, resulting in a violation of plaintiff's constitutional rights. Plaintiff's main argument is premised upon King's investigation of the incident after reviewing the videotape. Specifically, plaintiff argues that

> [t]he allegation is that defendant King actively participated in the violation by failing to find misconduct. He reviewed the videotape and the investigative reports and based upon that review required further explanatory reports which were inconsistent with what appears on the videotape. This review resulted in a discretionary determination that no misconduct occurred. It is that discretion which is questioned by plaintiff.

(Pl. Mem. in Opp. at 14). It is undisputed that King in fact reviewed the reports of the individuals involved, spoke with the individuals, and required that further reports be filed. (King Dep. at 69–79). Moreover, King reached the conclusion, based upon the videotape and the reports, that no misconduct occurred. (King Dep. at 70–73, 278). The question presented is thus whether, assuming King's investigation and conclusions were so patently at odds with the facts as to give rise to an inference deliberate indifference, such conduct amounts to personal involvement in a violation of plaintiff's rights.

■ The flaw in plaintiff's theory lies in its temporal scheme. One is hard pressed to

find a "tangible connection between the acts of the defendant and the injuries suffered", *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986), where the acts in question (King's alleged cover-up or bungling of the investigation) occurred long after the alleged constitutional deprivation (the use of excessive force on plaintiff). Hence, King's "misconduct" in the post-incident investigation cannot have caused, or even contributed to, the deprivation of plaintiff's right to be free from the use of excessive force, since that deprivation had already occurred. In other words, King's conduct occurring after the alleged beating "lacks the requisite affirmative link to [plaintiff's] injuries—that is, plaintiff cannot establish causation." *Sango v. City of New York,* 1989 WL 86995 at *20 n. 2 (E.D.N.Y.); *see also Tompkins v. Frost,* 655 F.Supp. 468, 472 (E.D.Mich.1987) ("wrongful conduct after any injury cannot be the proximate cause of the same injury").[7]

King may nonetheless be liable in a supervisory capacity, however, if he created a policy or custom under which the unconstitutional practices occurred. *Black,* 76 F.3d at 74; *Wright,* 21 F.3d at 501. Thus, whereas King's handling of the post-incident investigation may not, in and of itself, constitute personal involvement in a constitutional violation, it may be probative, along with other evidence, as to a longstanding custom or policy during King's tenure of covering up excessive force complaints against officers or protecting officers guilty of acts of excessive force. *See. e.g., White–Ruiz v. City of New York,* 1996 WL 603983 at *12 (S.D.N.Y.1996) (evidence that police commissioner was aware of "long standing practice of concealing [police corruption] and protecting officers guilty of corrupt acts" supported conclusion that commissioner approved or tolerated custom or usage leading to corruption-related misconduct in question); *Sango,* 1989 WL 86995 at *20 n. 2 ("Evidence of a municipal policymakers' response to misconduct can be helpful in determining the municipal policy

existing before the incident") (*citing McRorie v. Shimoda,* 795 F.2d 780, 784 (9th Cir. 1986); *Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir.1985), *cert. denied,* 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987)).

In support of his argument that King instituted a policy of failing to supervise or discipline his officers, and Officer Flanagan in particular, plaintiff relies upon the following deposition testimony of King: (1) that King has known Flanagan in excess of 40 years (King Dep. at 55); (2) that King knows Flanagan has a temper (*id.* at 216), knows Flanagan to overreact on occasion and be rude to members of the public (*id.* at 217); and (3) that King counseled Flanagan informally over the years with respect to Flanagan's treatment of members of the public. (*Id.* at 229). Plaintiff also alleges that King has imposed discipline on Flanagan on only one occasion, for being rude to members of the public, and in that instance the discipline was at the direction of the Commissioner. (*Id.* at 230–33).[8]

Plaintiff also relies on evidence that Chief King is aware of numerous lawsuits alleging excessive force against members of the Department that have been settled with no finding of wrongdoing. Plaintiff, however, mischaracterizes King's testimony. King admits that he is aware of several lawsuits that have been settled that alleged *misconduct.* (King Dep. at 78). King says nothing about whether those lawsuits involved the use of excessive force. Moreover, while some of the releases provided by plaintiff likely pertained to lawsuits alleging excessive force (*see, e.g.,* Release of Burton Colvin, Brickman Aff. Ex. 10), most reveal nothing about the nature of the underlying claims. Moreover, as the Court noted *supra,* the fact that claims were brought against the City reveals little about a supervisory official's personal involvement in constitutional violations. *See Lewis,* 949

---

7. Moreover, personal involvement premised upon a supervisory official's failure to remedy a wrong after learning of it arises where the official confirms or ratifies an ongoing violation by failing to put an end to it. *See, e.g., United States ex rel. Larkins v. Oswald,* 510 F.2d 583, 589 (2d Cir.1975).

8. Notably, none of the instances that King failed to discipline Flanagan involved allegations of excessive force. *See Woo v. City of New York,* 1996 WL 457337 at *6 (S.D.N.Y.1996).

F.Supp. at 164; *Mendoza*, 872 F.Supp. at 1119.

█ Plaintiff's attempt to string together bits and pieces of evidence which evince, at best, a lack of oversight on King's part as to unrelated issues, is insufficient to create an issue of fact as to whether King personally created or maintained a policy or custom of tolerating or encouraging the use of excessive force. Plaintiff's failure is illustrated by the disparity between his key allegations and the proof he provides in support of those allegations. For example, plaintiff alleges that King maintained a custom or policy in that he (1) failed to discipline or prosecute or in any matter deal with known incidents of wrongful beatings; (2) refuses to investigate complaints of previous incidents of wrongful beatings and, instead, officially claimed that such incidents were justified and proper; and (3) encouraged his officers to believe that improper beatings were permissible by means of both inaction and a cover-up of such wrongful beatings. (Pl. Mem. in Opp. at 1–2). Other than the present incident, however, plaintiff provides absolutely no proof of any occasion that King failed to deal with known incidents of wrongful beatings, or refused to investigate beatings. In fact, plaintiff provides no proof of any prior incidents of wrongful beatings at all.

Plaintiff's answers to defendants' interrogatories are particularly compelling in this respect. When asked to state each and every act of omission or commission that plaintiff alleges amounted to a "cover-up" by the City, plaintiff made reference only to the present incident. (Affidavit of John Pennock ["Pennock Aff."] Ex. 5 at A–25).[9] When asked to state each and every way plaintiff will claim that King permitted or tolerated a pattern or practice of unjustified beatings, plaintiff merely restated, in wholly conclusory fashion, the allegations in his Complaint. (*Id.* Ex. 5 at A–26). When asked to state each and every way King failed to discipline or prosecute officers, plaintiff did the same, repeating the "policy and custom" language

in mantra-like fashion. (*Id.* Ex. 5 at A–27). Finally, when asked to supply particulars regarding King's failure to discipline officers involved in wrongful beatings or refused to investigate such beatings, plaintiff responded that such information had been demanded of defendants but had not been provided. Discovery has now closed, and plaintiff has not produced any such information on this motion.

In short, plaintiff has failed to provide any proof that would create a genuine issue of fact as to King's personal involvement in a deprivation of plaintiff's constitutional rights. Because of such failure, defendant King's motion for summary judgment is granted.

### C. Plaintiff's "Cross–Motions"

Plaintiff cross-moves for leave to file a Third Amended Complaint to include an additional cause of action against the City for three allegedly retaliatory arrests of the plaintiff by the City during the pendency of this action. Additionally, plaintiff moves for a declaratory judgment declaring King the final policymaker for the Department.

The Uniform Pretrial Scheduling Order in this matter set an April 15, 1997 deadline for filing motions. As Magistrate Judge Smith pointed out, despite the fact that no extension was requested or granted to plaintiff to file cross-motions, he has done so. These motions are untimely. Magistrate Judge Smith ordered that defendants need not respond to these motions unless specifically ordered to do so by this Court. This Court has not ordered defendants to respond, since it agrees with Magistrate Judge Smith that the motions are untimely. (See Order of Smith, M.J., Dated May 22, 1997, Dk. # 74). Thus, these motions are denied.

█ Even if the Court were to consider the merits of plaintiff's motion for leave to amend, such leave would be denied. Under Fed.R.Civ.P. 15(a), "leave [to amend] shall be freely given when justice so requires." Leave should be denied, however, when it would be futile, cause undue delay or preju-

---

9. "[W]ithout evidence that other, prior incidents had been similarly covered-up, no valid causal relationship can be inferred between a cover-up and the underlying constitutional violation." *Pitt v. City of New York*, 1984 WL 1323 at *4 (S.D.N.Y.1984); *see also Turpin v. Mailet*, 619 F.2d 196, 202–03 (2d Cir.), cert. denied, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

dice, or when it is sought in bad faith. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). The claims plaintiff seeks leave to add involve arrests occurring on March 2, 1996, May 15, 1996, and September 8, 1996. (*See* Proposed Third Am. Compl. ¶¶ 63–70). Plaintiff offers no reason why these claims could not have been added on November 11, 1996 or November 20, 1996, when defendants consented to allow plaintiff to serve amended complaints. (*See* Affidavit of Veronica Carrozza O'Dell ["O'Dell Aff."] ¶ 5).

Moreover, to allow such amendment at this time surely would result in unfair prejudice and delay. Trial of this matter is currently scheduled for July 28, 1997. While plaintiff claims that he needs no discovery as to these new claims, defendants likely would need such discovery, and the trial date would further be postponed. The Court will not tolerate such last-minute litigation.

For all of these reasons, plaintiff's cross-motions are hereby denied.

## III. CONCLUSION:

For all of the foregoing reasons, then, it is hereby

**ORDERED,** that Flanagan's motion for bifurcation is **GRANTED,** and the trial shall proceed in accordance with the terms of this order; and it is further

**ORDERED,** that the summary judgment motions of King and Benton are **GRANTED,** and the claims against them are dismissed; and it is further

**ORDERED,** that plaintiff's cross-motions are **DENIED.**

**IT IS SO ORDERED.**