CITY OF LOS ANGELES ET AL. *v.* HELLER

No. 85–531.   Decided April 21, 1986

PER CURIAM.

Respondent Ronald Heller sued petitioners, city of Los Angeles and individual members of the Los Angeles Police Commission, and two Los Angeles police officers in the United States District Court for the Central District of California under the provisions of 42 U. S. C. § 1983. He claimed damages by reason of having been arrested without probable cause and having been the victim of excessive force in the making of the arrest. The incident arose as a result of the two Los Angeles police officers stopping him because of a suspicion that he was driving while intoxicated. In the words of the Court of Appeals for the Ninth Circuit:

> "The officers administered a series of field sobriety tests. Apparently dissatisfied with the results, the officers decided to take Heller to the station to undergo a breath test. When notified that he was under arrest, however, Heller became belligerent. One of the defendants, Officer Bushey, attempted to handcuff him. An altercation ensued. In the course of the struggle, Heller fell through a plate glass window." *Heller* v. *Bushey*, 759 F. 2d 1371, 1372–1373 (1985).

The District Court held a bifurcated trial, and first heard respondent's claims against one of the individual police officers.* The jury was instructed that Heller would make out his constitutional claim if he were arrested without reasonable cause, or if he were arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. *Id.*, at 1374. The jury was not instructed on any affirmative defenses that might have been asserted by

---

*The second of the two police officers named as defendants was granted summary judgment by the District Court.

the individual police officer. Tr. in No. 80-2643 (CD Cal.), pp. 803-822, 843. The jury returned a verdict for the defendant police officer and against respondent. The District Court then dismissed the action against petitioners, concluding that if the police officer had been exonerated by the jury there could be no basis for assertion of liability against the city or the persons constituting its Police Commission.

Respondent appealed to the Court of Appeals for the Ninth Circuit, and that court reversed the judgment of the District Court dismissing respondent's case against petitioners even though it did not disturb the verdict for the defendant police officer. Respondent urged, and the Court of Appeals apparently agreed, that "the jury could have believed that Bushey, having followed Police Department regulations, was entitled in substance to a defense of good faith. Such a belief would not negate the existence of a constitutional injury" (footnote omitted). 759 F. 2d, at 1373-1374.

The difficulty with this position is that the jury was not charged on any affirmative defense such as good faith which might have been availed of by the individual police officer. Respondent contends in his brief in opposition to certiorari that even though no issue of qualified immunity was presented to the jury, the jury might nonetheless have considered evidence which would have supported a finding of such immunity. But the theory under which jury instructions are given by trial courts and reviewed on appeal is that juries act in accordance with the instructions given them, see *Aspen Skiing Co.* v. *Aspen Highlands Skiing Corp.*, 472 U. S. 585, 604 (1985), and that they do not consider and base their decisions on legal questions with respect to which they are not charged. We think that the Court of Appeals' search for ambiguity in the verdict was unavailing; as that court itself noted later in its opinion, "[b]ecause the instructions required a verdict for [respondent] if *either* the due process *or* the excessive force claim was found, the jury's

verdict for the defendant required a negative finding on both claims." 759 F. 2d, at 1374, n. 3. This negative, it seems to us, was conclusive not only as to Officer Bushey, but also as to the city and its Police Commission. They were sued only because they were thought legally responsible for Bushey's actions; if the latter inflicted no constitutional injury on respondent, it is inconceivable that petitioners could be liable to respondent.

The Court of Appeals also stated:

> "We must conclude that the general verdict does not foreclose a finding that Heller suffered a constitutional deprivation. Heller's *Monell* claim survived the general verdict. . . . The jury verdict, of course, conclusively determined that there was probable cause to arrest Heller. On the other hand, it is equally clear that whether the application of force in accordance with Police Department regulations in this case exceeded constitutional limits has not been determined." *Id.*, at 1374–1375.

But this was an action for damages, and neither *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm. If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point.

The petition for certiorari is granted, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BRENNAN took no part in the consideration or decision of this case.

JUSTICE MARSHALL dissents from this summary disposition, which has been ordered without affording the parties prior notice or an opportunity to file briefs on the merits. See *Cuyahoga Valley R. Co.* v. *Transportation Union*, 474 U. S. 3, 8 (1985) (MARSHALL, J., dissenting); *Maggio* v. *Fulford*, 462 U. S. 111, 120–121 (1983) (MARSHALL, J., dissenting).

JUSTICE STEVENS, with whom JUSTICE MARSHALL joins, dissenting.

Whenever the Court decides a case without the benefit of briefs or argument on the merits, there is a danger that it will issue an opinion without the careful deliberation and explication that the issues require. Today's *"per curiam"* opinion is a fair illustration of the problem. The two important issues presented in this case are not even identified in that document. The District Court's decision to dismiss the action against the city, the Police Department, and the Police Commissioners necessarily rested on two assumptions: (1) there was an inherent inconsistency between the jury verdict in favor of Officer Bushey and a possible verdict against the municipal defendants and (2) that inconsistency required the dismissal of the action against the municipal defendants. Far from specifically addressing those issues, however, the District Court dismissed the action against the city on the ground that it had "become moot."[1]   In a similar vein, this

---

[1] See 8 Record 844 ("With respect to the Monell cause of action, which was bifurcated from the initial trial, the Court is now convinced that has become moot by reason of the verdict in favor of the defendant and the Court is ordering dismissal of that cause of action at this time"); 2 *id.,* Doc. No. 209, dismissal order ("the plaintiff's theory of liability against the defendants, CITY OF LOS ANGELES, LOS ANGELES BOARD OF POLICE COMMISSIONERS and LOS ANGELES POLICE DEPARTMENT, based on the case of *Monell* v. *Department of Social Services of the City of New York*, 436 U. S. 658 . . . is moot").

Court rests its summary decision on the maxim that "juries act in accordance with the instructions given them." *Ante*, at 798. In my view, neither of the necessary assumptions for the District Court's action—and for this Court's reinstatment of its decision—is remotely present in this case.

I

The first necessary assumption is that there would be an inevitable inconsistency between the jury verdict of no liability for Officer Bushey and a possible verdict of liability against the municipal entities; in the absence of such an inconsistency, the District Court's decision, and this Court's reinstatement of it, are simply inexplicable.

It is undisputed that Ronald Heller crashed through a plate-glass window after some kind of an altercation with Officer Bushey. He had been stopped on suspicion of driving while intoxicated and given sobriety tests.[2] In his claim against the municipal entities, Heller contended that the city and the Police Department had adopted a policy of condoning excessive force in making arrests, that the policy was unlawful, and that he had been injured by the application of that policy at the time of his arrest. In his claim against Officer Bushey, Heller contended that his constitutional rights were violated because Officer Bushey had employed "unreasonable force" in arresting him.

On the day before trial, the District Judge bifurcated the trial into two phases—the first against Officer Bushey and the second against the municipal entities. The record contains no explanation for this decision, but it does reveal that Heller's counsel opposed bifurcation.[3]

---

[2] After the altercation, Heller was given an alcohol level test, and was found to have one-tenth the level of alcohol in his body necessary for a finding of driving while intoxicated under California law. 5 *id.*, at 134–136. Heller was never charged with driving while intoxicated. *Ibid.*

[3] See 5 *id.*, Doc. No. 203, minutes of chambers conference (Oct. 18, 1982) ("Court confers with Counsel re: Pretrial order, Jury trial on 10/19/82, Jury Instructions, Defendant's amended witness list and bifurca-

In the proceeding against Officer Bushey, considerable evidence of the Los Angeles Police Department's policy and custom on the use of force was introduced. An expert witness testified regarding Los Angeles' officially sanctioned use of "escalating force," culminating in the use of the notorious "chokehold."[4] Officer Bushey himself testified that Heller's flight through the window resulted from his attempt to impose a chokehold, and that he was carefully following official Police Department policy.[5] Officer Bushey's superior, Sergeant Shrader, also testified that Officer Bushey's actions were in complete compliance with official Police Department policy.[6] Finally, Officer Bushey's attorney repeatedly

---

tion of case. Plaintiff counsel opposes Bifurcation. Defendant does not oppose bifurcation").

[4] See 5, *id.*, at 157–158 (testimony of James Fyfe) ("The Los Angeles Police Department employs a scale of escalation in the use of force. . . . [T]he Los Angeles Police Department varies from every other major police department I know of. The Los Angeles Police Department says that if that compliance hold fails to work the next degree of force to be used is a chokehold or, as the police department calls them, a carotid control hold and modified carotid hold and bar arm control holds"). Cf. *Los Angeles* v. *Lyons*, 461 U. S. 95, 97, n. 1 (1983) (describing chokehold); *id.*, at 114–119 (MARSHALL, J., dissenting) (reviewing Los Angeles Police Department's use of chokeholds and noting that 16 deaths had resulted from chokeholds since 1975). At the time of Heller's trial, *Lyons* was pending before this Court.

[5] 5 Record 99–100 ("As he began his two steps forward I applied—I put my left arm around his—the portion I tried to get was the front part of his throat. You use the blade of your wrist on the person's throat. As we are supposed to when we are trying to take someone into custody use verbal commands of first asking verbally and then demanding verbally. If that does not work we use what is called a pain compliance, which is trying to twist someone's wrist where the pain hurts them and they'll comply with your request. . . . I tried to get the blade of my wrist around to his throat to apply pressure to his throat, which is also a pain compliance hold").

[6] See 6 *id.*, at 279–281 (testimony of Sergeant Shrader) (describing Police Department's "accelerated force theory" and concluding that Officer Bushey's use of a chokehold would have been "within the policy").

emphasized that his client's actions were entirely consistent with established Department policy.[7]

In submitting the claim against Officer Bushey to the jury, the trial judge gave an instruction that simply stated that whether or not the force used in making an arrest is unreasonable "is an issue to be determined in the light of all the surrounding circumstances."[8]  After deliberating several hours, the jury returned a general verdict in favor of the officer.

Thus, despite the majority's summary assertion to the contrary, it is perfectly obvious that the general verdict rejecting the excessive force claim against Officer Bushey did not necessarily determine the constitutionality of the city's "escalating force" policy—a subject on which the jury had received no instructions at all.  The verdict merely determined that the officer's action was not unreasonable "in the light of all the surrounding circumstances"—which, of course, included the evidence that Officer Bushey was merely obeying orders and following established Police Department policy.

As a result, there was no necessary inconsistency between the verdict for Officer Bushey and a possible verdict of liabil-

[7] See, e. g., 5 id., at 170 ("[T]he carotid hold was a hold that was being taught to the Los Angeles Police Department"); 6 id., at 279 (referring to "the accelerated force theory that the police department has"); id., at 281 (referring to "the policy of what police department officers do").  See also Officer Bushey's counsel's closing argument, 7 id., at 699 ("In this case it's not the City that's the defendant.  It's Officer Bushey"); id., at 706 (citing "testimony concerning our own policies and procedures as to the Los Angeles Police Department"); ibid. ("[T]he procedures which Officer Bushey followed are exactly what he's taught and the reasons he's taught to do it"); id., at 716 ("It's Officer Bushey who's the defendant"); id., at 718 ("Officer Bushey was trying to do his job").

[8] "Whether or not the force used in making an arrest, preventing an escape, or overcoming resistance was expressive [sic], unreasonable or violent is an issue to be determined in the light of all the surrounding circumstances."  8 id., at 815–816.

ity against the municipal defendants. On that basis alone, the District Court plainly erred in dismissing as "moot" the suit against the municipal defendants, and the Court of Appeals was plainly correct to reverse the dismissal.[9]

## II

In view of the fact that the Court of Appeals correctly concluded that there was no necessary inconsistency between a verdict exonerating Officer Bushey and a verdict holding the city and Police Department liable for the "escalating force" policy, it did not have to consider the appropriate response to a possible inconsistency in the context of a bifurcated trial.

Inconsistent verdicts are, of course, a familiar phenomenon. In a criminal case, a jury's apparently inconsistent verdict is allowed to stand.[10] In a civil case, the rule is less

---

[9] The Court of Appeals concluded:

"The jury, in substance, was instructed that Heller was deprived of liberty without due process if he was arrested without reasonable cause. The jurors were further instructed that Heller's constitutional rights were violated if he was arrested with "unreasonable force" that exceeded the force necessary under the circumstances to effect arrest. The jury's verdict for the defendant therefore embodies a finding that Heller was arrested for reasonable cause *and* that the amount of force used was not unreasonable or excessive. The difficulty is that the conclusion that the force was reasonable could have been derived either from Police Department regulations, which incorporate a theory of 'escalating force,' or from a constitutional standard entirely independent of such regulations. We cannot say which with assurance." *Heller* v. *Bushey*, 759 F. 2d 1371, 1374 (CA9 1985) (footnote omitted).

[10] See *United States* v. *Powell*, 469 U. S. 57 (1984) (reaffirming general rule that inconsistent verdicts can stand); *Harris* v. *Rivera*, 454 U. S. 339, 345 (1981) ("Inconsistency in a verdict is not a sufficient reason for setting it aside"); *Hoag* v. *New Jersey*, 356 U. S. 464, 472 (1958) ("[J]ury verdicts are sometimes inconsistent or irrational"); *United States* v. *Dotterweich*, 320 U. S. 277, 279 (1943) ("Whether the jury's verdict was the result of carelessness or compromise or a belief that the responsible individual should suffer the penalty instead of merely increasing, as it were, the cost of running the business of the corporation, is immaterial. Juries may indulge in precisely such motives or vagaries"); *Dunn* v. *United States*, 284 U. S. 390, 393 (1932) ("Consistency in the verdict is not necessary").

clear.[11]  Nevertheless, in contrast to the Court's blithe assumption today, it is far from certain that the District Court's action—the dismissal—was an appropriate response, even if somehow a verdict against the municipal entities might have created an inconsistency.  First, the Court ignores the fact that, in certain circumstances, a court retains the authority, even in a civil case, to allow an apparently inconsistent verdict to stand.[12]  Second, the Court ignores the

Cf. *Ulster County Court* v. *Allen*, 442 U. S. 140, 168 (1979) (BURGER, C. J., concurring) ("Courts have long held that in the practical business of deciding cases the factfinders, not unlike negotiators, are permitted the luxury of verdicts reached by compromise").

[11] See, *e. g.*, Bickel, Judge and Jury—Inconsistent Verdicts in the Federal Courts, 63 Harv. L. Rev. 649, 654 (1950) ("[T]here is not in a civil case the equivalent of a precedent such as *Dunn* [v. *United States, supra*] to overrule in upsetting inconsistent verdicts.  The argument outlined against extending the *Dunn* rule to civil cases is thus quite a plausible one.  But it is not unanswerable") (footnote omitted).

[12] Indeed, in explaining why an apparently inconsistent verdict in a civil case should not be disturbed, Justice Brandeis cited the leading case on the permissibility of inconsistent verdicts in a criminal context.  See *Fairmount Glass Works* v. *Cub Fork Coal Co.*, 287 U. S. 474, 485 (1933) (citing *Dunn* v. *United States*).  See also F. James & G. Hazard, Civil Procedure 384 (3d ed. 1985) ("[T]he refusal of a trial court to set aside a verdict obviously representing a compromise has frequently, and quite properly, been upheld"); *id.*, at 394 ("One of the great values of jury trial . . . is its ability to reflect the community sense of over-all fairness, and this may not in all cases coincide with the written law and the instructions which the court must give"); *Karcesky* v. *Laria*, 382 Pa. 227, 235, 114 A. 2d 150, 154 (1955) ("Where the evidence of negligence, or contributory negligence, or both, is conflicting or not free from doubt, a trial judge has the power to uphold the time-honored right of a jury to render a compromise verdict, and to sustain a verdict which is substantial"); *Jayne* v. *Mason & Dixon Lines, Inc.*, 124 F. 2d 317, 319 (CA2 1941) (L. Hand) ("We do not mean to imply however that we should have thought it fatal to the wife's recovery if no rational reconciliation of the verdicts was possible.  *Dunn* v. *United States*, 284 U. S. 390"").  Cf. Note, Inconsistent Verdicts in Civil Trials, 45 Harv. L. Rev. 1230, 1234 (1932) (observing that, in some jurisdictions, "a master can not complain solely because the servant was exonerated at the same trial.  If the evidence is sufficient to support the verdict against the master, his appeal will be denied") (footnote omitted).

fact that, when faced with an apparently inconsistent verdict, a court has a duty to attempt to read the verdict in a manner that will resolve inconsistencies.[13]   Third, the Court ignores the fact that, upon receiving an apparently inconsistent verdict, the trial judge has the responsibility, not to retain half of the verdict, but to resubmit the question to the jury.[14]   Finally, the Court ignores the fact that, if verdicts are genuinely inconsistent and if the evidence might support either of the "inconsistent" verdicts, the appropriate remedy is ordinarily, not simply to accept one verdict and dismiss the other, but to order an entirely new trial.[15]

---

[13] See *Gallick* v. *Baltimore & Ohio R. Co.*, 372 U. S. 108, 119 (1963) (In considering jury answers to questions in a special verdict, "it is the duty of the courts to attempt to harmonize the answers, if it is possible under a fair reading of them . . . .   We therefore must attempt to reconcile the jury's findings, by exegesis if necessary, . . . before we are free to disregard the jury's special verdict and remand the case for a new trial"); *Atlantic & Gulf Stevedores, Inc.*, v. *Ellerman Lines, Ltd.*, 369 U. S. 355, 364 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way"); *Affolder* v. *New York, Chi. & St. L. R. Co.*, 339 U. S. 96 (1950); *Fairmount Glass Works*, 287 U. S., at 485 (Brandeis, J.) ("Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct"); *Union Pacific R. Co.* v. *Hadley*, 246 U. S. 330, 334 (1918) (Holmes, J.) ("[S]ince the [jury] finding was possible on the evidence it cannot be attributed to disregard of duty. . . .  Beyond the question of attributing misconduct to the jury we are not concerned to inquire whether its reasons were right or wrong").

[14] See, *e. g.*, *Dickerson* v. *Pritchard*, 706 F. 2d 256, 259 (CA7 1983) ("[T]he trial court properly resubmitted the inconsistent verdicts to the jury for reconsideration"); *University Computing Co.* v. *Lykes-Youngstown Corp.*, 504 F. 2d 518, 547 (CA5 1974) ("[I]f the jury returns two inconsistent verdicts, the trial court may resubmit the issue to them for clarification"); *Hopkins* v. *Coen*, 431 F. 2d 1055, 1059 (CA6 1970) (upon receipt of inconsistent verdicts, trial court could have sent jury "back to the jury room to further deliberate with appropriate instructions to bring back consistent verdicts"); *Alston* v. *West*, 340 F. 2d 856, 858 (CA7 1965) (when jury returned an inconsistent verdict, "the court properly exercised its discretion in resubmitting the case to the jury").

[15] See, *e. g.*, *Malley-Duff & Associates* v. *Crown Life Ins. Co.*, 734 F. 2d 133, 145 (CA3) ("We conclude that the answers to Questions 1, 2(A), and

Although the Court fails to address it, the question this case raises (if, in fact, the initial view of inevitable inconsistency is accepted) is whether a different set of principles should apply in a bifurcated trial—more narrowly, in a trial that was bifurcated over the objection of the plaintiff. Because the question has not been argued, I do not foreclose the possibility that bifurcation should make a difference, but it is not immediately apparent to me why it should. In this case, the same jury would have passed on the municipal entities' liability, and would have relied on the evidence adduced in the first phase of the trial as well as that presented in the second phase. At the very least, it is unclear to me why the normal devices for addressing an apparently inconsistent verdict—construing the verdict in a manner that resolves the inconsistency; resubmitting the case to the jury for *it* to resolve the inconsistency; or even ordering a new trial—should be unavailable in a bifurcated context.

If the Court's unprecedented, ill-considered, and far-reaching decision happens to be correct, defendants as a class have been presented with a tactical weapon of great value. By persuading trial judges to bifurcate trials in which both the principal and its agents are named as defendants, and to require the jury to bring in its verdict on the individual claim first, they may obtain the benefit of whatever intangible factors have prompted juries to bring in a multitude of inconsistent verdicts in past years; defendants will no longer have to abide the mechanisms that courts have used to mitigate

---

2(B) may be considered inconsistent . . . . We will vacate the $900,000 verdict in the state law claims and order a new trial"), cert. denied, 469 U. S. 1072 (1984); *Global Van Lines, Inc.* v. *Nebeker*, 541 F. 2d 865, 868 (CA10 1976) (citing "the rule which says that inconsistencies which show jury confusion serve to mandate a new trial"); *Wood* v. *Holiday Inns, Inc.*, 508 F. 2d 167, 175 (CA5 1975) ("Where verdicts in the same case are inconsistent on their faces indicating that the jury was confused, a new trial is certainly appropriate and may even be required"). Cf. Fed. Rule Civ. Proc. 49(b) (appropriate remedy for inconsistent special verdicts and general verdict is resubmission to the jury, or a new trial).

and resolve apparent inconsistencies.[16]   Perhaps that is an appropriate response to the current widespread concern about the potential liabilities of our municipalities, but I doubt it.   Cf. *Oklahoma City* v. *Tuttle,* 471 U. S. 808, 843–844 (1985) (STEVENS, J., dissenting).

### III

The Court today reverses an interlocutory decision in a constitutional rights case on the basis of assumptions that dramatically conflict with the record and with settled legal principles.   The Court mistakenly assumes that there was a necessary inconsistency between the verdict of no liability against the individual officer and a possible verdict against the municipal defendants; it then mistakenly assumes that dismissal was an appropriate response to the perceived inconsistency.   Perhaps not coincidentally, the Court achieves these results without the aid of briefs or argument, and relies on an anonymous author to explain what it has done.

I respectfully dissent.

---

[16] Cf. *Alston* v. *West, supra* (in negligence suit against flower shop and driver for automobile accident, jury initially returned verdict of liability for flower shop and no liability for driver; after case was resubmitted, jury returned liability verdicts against both employer and driver).