**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LEATRICE ELLEN CARICOFE, Personal
Representative of the Estate of Neil
Allen Caricofe; RICHARD A.
CARICOFE, Personal Representative
of the Estate of Neil Allen Caricofe,
            *Plaintiffs-Appellants,*

v.

MAYOR AND CITY COUNCIL OF OCEAN
CITY, MARYLAND, a body corporate
and politic; ROLAND F. POWELL,
Mayor; DAVID MASSEY, Chief; ERIC
ALBAN, Officer; KATHLEEN
BRAEUNINGER, Sergeant; JENNIFER
ENGSTROM, Officer; JAMES GRADY,
Officer; FREDDIE HOWARD, Officer;
MATTHEW JONES, Officer; EDWARD
SCHMITT, Officer; MONICA SKARPAC,
Officer; RONNIE TOWNSEND, Officer;
JOHN WHITTINGTON, Sergeant;
EDMOND O'BRIEN, Sergeant; OCEAN
CITY POLICE DEPARTMENT,
            *Defendants-Appellees.*

No. 01-1809

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Chief District Judge.
(CA-98-1740-S)

Argued: February 28, 2002

Decided: April 1, 2002

Before WILKINSON, Chief Judge, and NIEMEYER and
MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Benjamin Lipsitz, Baltimore, Maryland, for Appellants. Robert Charles Verderaime, VERDERAIME & DUBOIS, P.A., Baltimore, Maryland; Guy Robins Ayres, III, AYRES, JENKINS, GORDY & ALMAND, P.A., Ocean City, Maryland, for Appellees. **ON BRIEF:** Gerald C. Ruter, LAW OFFICE OF GERALD C. RUTER, Baltimore, Maryland; Edward Lulie, III, Harriet E. Lulie, Jefferson, Maryland, for Appellants.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

PER CURIAM:

Neil Caricofe died, apparently from cardiovascular disease and the effects of multiple drugs, after a lengthy altercation with Ocean City, Maryland police, who were attempting to subdue him. Caricofe's parents filed this action, under 42 U.S.C. § 1983 and state law, against the police officers for using excessive force and against their supervisors, the police department, and Ocean City, for inadequate training and supervision. The district court granted summary judgment to the officers on the basis of qualified immunity and to the other defendants on the basis that no constitutional violation was committed by the officers. We affirm.

I

Lisa Mulvihill, the night desk clerk at the Fenwick Inn in Ocean City, Maryland, received a call from a guest in the early morning

hours of August 23, 1996, informing her that a large naked man was running around the hallway on the seventh floor. Mulvihill went up to the seventh floor and saw a large naked white male (Neil Caricofe), who she perceived to be over six feet tall and approximately 290 pounds, "jumping around and banging himself against the walls." She attempted to speak to the man, but when he did not answer her or speak at all, she went back down to the first floor lobby and called the Ocean City police. Before the police arrived, Mulvihill received another complaint, this time that the naked man was banging on guestroom doors on the seventh floor. She called the police again, asking them to meet her on the seventh floor, and then returned to that floor. When she arrived, Neil Caricofe was jumping around and banging into the walls. She again tried to speak with Caricofe, but he remained unresponsive.

Shortly thereafter, Officer Howard arrived and went directly to the seventh floor, where he saw a naked, sweaty Caricofe in the hallway, "bouncing on his tippy toes as a boxer would" and moving his arms and neck around as if to stretch them. Caricofe also appeared to be extremely strong, seemed like he was "strung out on some kind of drug," and periodically would appear to lose his balance and bump up against the wall. Officer Howard decided that Caricofe needed to be detained before someone got hurt, and he called for backup. While waiting, he attempted to engage Caricofe in conversation, asking him his name, room number, and similar matters, but received no response.

A few minutes later, Acting Sergeant Kathleen Braeuninger and Officer Matthew Jones arrived on the scene. Caricofe was still moving around, bouncing up and down occasionally, clenching his fists, and pounding on the walls. The officers decided to restrain Caricofe so they could figure out why he was acting so strangely. Sergeant Braeuninger continued to ask Caricofe questions and did get him to tell her that his name was Neil, but otherwise Caricofe remained silent and continued moving around the hallway in an aggressive manner, periodically turning to the officers and growling and flexing his muscles.

A short while later, Officer Alban arrived on the scene with a "violent prisoner restraining device," a rope contraption used to bind the

feet of violent prisoners. The other officers were still talking to Caricofe, trying to get him to lie down, but Caricofe continued running around, jumping up and down, and banging into the walls. All of the officers believed that Caricofe was on some sort of drug, possibly PCP, which can give a person super human strength. In fact, later toxicology reports revealed that Caricofe had four drugs in his system — ephedrine, gamma hydroxybutyrate, anabolic steroids, and ethanol. The first three are drugs commonly used by body builders.

Believing that Caricofe was a danger to himself, the other hotel guests, and themselves, the officers decided that they needed to subdue Caricofe and then call for medical assistance. They began by ordering Caricofe to lie down, but he did not comply. He did eventually, however, stumble against a door and fall to his knees, prompting the officers to use the opportunity to try to restrain him with handcuffs. Officers Howard and Jones approached Caricofe and, each using his own pair of handcuffs, placed a cuff on each wrist and tried to bring the cuffs together behind Caricofe's back. As soon as tension was applied to his arms, however, Caricofe became agitated, threw the officers off of him, stood up, and began swinging his arms violently and twisting and "wallowing around." Thus failing in their attempt to place Caricofe in handcuffs, the officers continued to yell at Caricofe, ordering him to lie down on the floor. Caricofe, however, continued to walk around, swinging his arms and the two sets of handcuffs, one set now attached to each wrist.

Sergeant Braeuninger then warned Caricofe that if he did not comply with their demands, they would spray him with pepper spray. When Caricofe did not comply, he was sprayed by all four officers, but the spray did not appear to have any effect on him. Caricofe continued walking around swinging his arms and shaking his head. He began advancing toward Officers Howard and Jones and eventually pinned Officer Howard up against the wall, holding him by his shirt. As Officers Jones and Howard struggled to get Caricofe to release Howard, Sergeant Braeuninger radioed for more help, and Officer Alban, using Braeuninger's collar microphone called in a "Signal 13," indicating an officer was in serious trouble.

The officers then began striking Caricofe with their batons on his buttocks and legs. Caricofe did not, however, go to the floor, but

rather continued swinging his arms around. He then ran to the end of the hallway and went into the vending machine alcove where "he started violently turning around, thrusting and knocking his shoulders and head against the soda machine very violently." The officers, however, did not go into the vending machine alcove because they felt it was too confined of an area to be a safe place to restrain Caricofe.

Caricofe then came running out of the vending machine area, pushed through the door to the stairway and started down the stairs, despite the fact that Officer Jones was hitting him in the shin with a nightstick and ordering him to stop. The officers followed him down the stairs and Sergeant Braeuninger again radioed for help.

In the parking lot, the officers attempted to tackle Caricofe, but he just bounced off of a car and continued running. Eventually, the officers managed to take Caricofe down to his hands and knees. At this point other officers had arrived on the scene, and Officer Townsend ran over and used pepper foam on Caricofe, which again seemed to have no effect. Caricofe stood up and shed all four officers who were attempting to hold him down. Townsend then dropped his pepper spray and began to use his baton on Caricofe, striking him across his left thigh. When Caricofe did not comply with Townsend's orders to get down, Townsend struck Caricofe a second time. Officers Skarpac and Engstron had also arrived on the scene, and they joined Officer Townsend in attempting to bring Caricofe down, striking Caricofe with their batons on his lower legs. Caricofe ran away again, and the officers followed.

Officer Alban then tried to "football tackle" Caricofe, but he just bounced off of him. After Alban's ineffective tackle, Sergeant Whittington grabbed on to Caricofe, several other officers converged on Caricofe, and finally the group was able to take him to the ground. The officers then struggled to handcuff Caricofe and put the "violent prisoner restraining device" on his legs. They held Caricofe down by leaning and kneeling on him because he continued to struggle and resist. Eventually the officers subdued Caricofe, and he stopped moving. After Caricofe stopped moving, Officer Alban confirmed that he was still breathing. But when the paramedics arrived, the officers realized that while they were waiting, Caricofe had stopped breathing.

They assisted the paramedics in performing CPR, but their resuscitation efforts failed, and Caricofe died.

The autopsy revealed that Caricofe was 6′3″ tall and weighed 262 pounds. It confirmed that during the altercation, he had suffered many external injuries to his head, neck, torso, and upper and lower extremities, including a laceration to the top of his head. Most of the injuries, however, were on the legs. The pathologist reported the cause of death as "multiple drug use & arteriosclerotic cardiovascular disease," and the nature of death as "undetermined."

Caricofe's parents, Leatrice and Richard Caricofe, commenced this action under 42 U.S.C. § 1983 and state law against the officers, their supervisors, the police department, and Ocean City, alleging that the police officers had used excessive force in apprehending their son, and that the other defendants had improperly trained and inadequately supervised the officers. On the defendants' motion for summary judgment, the district court entered judgment in favor of all defendants, concluding that the officers were "plainly entitled to qualified immunity" and that, therefore, the plaintiffs had not demonstrated that the other supervisory defendants had violated Caricofe's constitutional rights. This appeal followed.

II

The plaintiffs contend that the officers' use of force was not objectively reasonable, and therefore they were not entitled to qualified immunity. The officers assert that even viewing the facts in the light most favorable to the plaintiffs, their use of force was reasonable. Therefore, they argue, the plaintiffs have failed to demonstrate any constitutional violation.

Public officials are generally granted qualified immunity from lawsuits based on reasonable discretionary acts taken in carrying out their official duties. Because of the need to protect constitutional rights while also avoiding a chilling effect on the conduct of these officers, qualified immunity balances "[t]he public interest in deterrence of unlawful conduct and in compensation of victims," *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982), with the public interest in having officials act "with independence and without fear of consequences," *id.*

(quoting *Pierson v. Ray*, 386 U.S. 547, 554 (1967)); *see also Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (recognizing that "permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties"). "[W]hether an individual official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson*, 483 U.S. at 639 (internal citations omitted) (quoting *Harlow*, 457 U.S. at 818-819).

The analysis in a claim for qualified immunity begins by first considering whether "[t]aken in the light most favorable to the party asserting the injury . . . the facts alleged show the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). If this initial question is answered affirmatively, "the next sequential step is to ask whether the right was clearly established . . . in light of the specific context of the case." *Id.*

Thus, in a suit claiming excessive force, the initial inquiry is "whether the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). "[T]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. In addition, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

In this case, we cannot conclude that the police officers acted unreasonably. They were faced with a situation in which a large and exceptionally strong man was acting erratically and violently, placing at risk not only himself, but also the hotel guests and the police officers. The officers necessarily made a split-second judgment that the man needed to be restrained and then proceeded with this effort, escalating their force only when the previous level of force proved

ineffective. They began by trying simply to handcuff Caricofe. When that did not work — indeed, it resulted in Caricofe pinning one officer against a wall — they tried to subdue him with pepper spray. When the pepper spray failed to subdue Caricofe, they were forced to resort to striking him with their nightsticks in the lower extremities, but deadly force was never used, nor considered. This sequence of events demonstrates a reasoned and restrained approach, rather than unreasonableness. That Caricofe died after the struggle is most tragic, but it cannot be said that this was from any *unreasonable* conduct on the part of the officers.

Having concluded that the plaintiffs have not demonstrated any constitutional violation, it becomes unnecessary for us to consider whether the rights at issue were clearly established such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 121 S.Ct. at 2156 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The district court correctly ruled that the officers were entitled to qualified immunity.

Because the police officers did not violate Caricofe's constitutional rights, the other defendants may not be held liable for failing to train or supervise those officers. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (holding that a municipality cannot be held liable for an official policy or custom if it has been determined that the individual defendants did not violate the plaintiff's constitutional rights); *Young v. City of Mount Ranier*, 238 F.3d 567, 579 (4th Cir. 2001) ("The law is quite clear in this circuit that a section 1983 failure-to-train claim cannot be maintained against a governmental employer in a case where there is no underlying constitutional violation by the employee."); *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999) ("As there are no underlying constitutional violations by any individual, there can be no municipal liability.").

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.