**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0327n.06
Filed: May 12, 2009

No. 08-5884

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DAVID DENNING, deceased, by next friend JOE DENNING, on behalf of OLIVIA DENNING, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| JEANETTE WEBB, mother and guardian of the minor plaintiff, Olivia Denning, | ) ) ) | |
| Plaintiff, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR |
| v. | ) ) | THE MIDDLE DISTRICT OF TENNESSEE |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY; DON DAVIDSON, individually and in his official capacity, | ) ) ) ) | **O P I N I O N** |
| Defendants-Appellees. | ) ) ) | |

Before: MERRITT, COOK, and WHITE, Circuit Judges.

**WHITE, Circuit Judge.** On the night of January 27, 2006, Officer Don Davidson (Davidson) fired one gunshot through a windowpane in the closed door of the home of David Denning (Denning) after Denning approached the door while carrying a handgun and did not respond to Davidson's commands to drop the weapon. Denning sustained a single gunshot wound to the chest and died that night.

Plaintiffs filed suit pursuant to 42 U.S.C. § 1983 against defendants, Davidson (individually and in his official capacity) and the Metropolitan Government of Nashville and Davidson County

(collectively, defendants),[1] alleging deprivations of Denning's rights under the Second, Fourth, Fifth, and Fourteenth Amendments. After the district court dismissed certain claims, defendants filed a motion for summary judgment on the remaining ones, which the court granted. Certain plaintiffs appealed.[2] On appeal, they expressly do not contest the district court's conclusion that Officer Davidson did not use excessive force and was thus entitled to qualified immunity, but instead dispute other aspects of the district court's ruling.

Though the facts of this case strike us as tragic and disturbing, we disagree with appellants' arguments on appeal and must AFFIRM.

## I

The district court ably recounted the facts:

> On the evening of January 27, 2006, 15 calls were placed in the course of an hour and a half from a cellular telephone belonging to David Denning to a local Papa John's Pizza store. The man who called each time was belligerent, cursing at the employees who answered his calls. After a number of such calls, the pizza store manager informed the caller that the store would not do business with him that evening, and then called the police non-emergency number to lodge a formal complaint of harassment.

> However, a food order from one of the placed calls was accidentally processed, and a pizza order for "David" was scheduled to be delivered at the upstairs entrance of Denning's address that evening. When the delivery woman ("Ms. Scott") arrived at the back of Denning's residence, she noticed a black dog barking outside. Out of concern that the dog might bite her, she called the telephone number on the order ticket and asked the man to come outside to get the pizza. Ms. Scott then heard things banging around indoors "like he lost his balance or something" and saw a man come from the second floor apartment onto the landing area of the stairs, weaving back and forth. Upon the man's assurance that the dog would not bite, Ms. Scott climbed the stairs leading up to Denning's second floor apartment. She could smell

---

[1]Plaintiffs also filed suit against Chief of Police Ronal W. Serpas, but subsequently agreed to dismiss their claims against him.

[2]Plaintiff Jeanette Webb, mother and guardian of minor Olivia Denning, is not an appellant.

alcohol on his breath. Ms. Scott asked the man if he had a pen to sign the credit card slip, but he said "no," took the pizza out of her hands and thanked her. She reiterated that he needed to sign the credit card slip, but the man said, "have a good night," went back into the apartment with the food, and closed the door.

Ms. Scott retrieved an ink pen from her car and ascended the stairs a second time. As she approached Denning's back door and knocked, she saw the man sitting on the couch eating pizza. Ms. Scott watched the man get up, walk to a counter area, unzip a black bag, pull a gun out from the bag, and walk towards her with the gun pointed in her direction. Immediately, Ms. Scott turned around and fled down the stairs, hearing the back door open behind her as she descended. She hid briefly, looking back towards the stairs to see if the man was close behind her. Seeing no one she ran to her car and called 911. Ms. Scott informed the 911 operator that the man pulled a gun on her when she returned with a pen for him to sign a credit card receipt. She provided the operator a physical description of the man, and said that he was "so intoxicated he's falling all over his apartment." Ms. Scott was told to standby and she agreed to wait for the police at a nearby intersection.

Metropolitan Nashville Police Officer Davidson responded to the dispatcher's call and arrived at the scene some minutes later. He spoke with Ms. Scott who repeated the details of the incident to him. Officer Greg Lyons ("Officer Lyons") arrived at the scene shortly thereafter, and Officer Davidson informed Officer Lyons of Ms. Scott's encounter. Together the two officers approached the back of the building, which was dark and had no outdoor lighting, with flashlights on and weapons drawn. After searching around the outdoor area to be sure the man was not hiding, the officers ascended the stairs to the second floor apartment. Officer Davidson turned off his flashlight and positioned his gun in the "low-ready" position – pointing at the ground. He approached the landing at the top of the stairs while Officer Lyons remained on a landing halfway up the stairs. From the window on the top part of the apartment door, Officer Davidson saw Denning sitting at a desk about 20 feet away. A bottle of liquor was on the desk. Officer Davidson tapped on the door a few times with his flashlight, but did not identify himself as a police officer. According to Officer Davidson's testimony, Denning turned around, looked at the door, and walked towards the door. As Denning passed a kitchen counter about eight (8) or nine (9) feet away from Office Davidson, Denning reached into a black bag resting on the counter and withdrew a handgun.

The parties disagree as to Denning's actions after he reached for his gun. Defendants, relying on an interview given by Officer Davidson the night of the incident and Officer Davidson's deposition testimony in this case, maintain that after Denning pulled the handgun from the bag, he pointed the gun in an "elbow over holster" position such that the gun was pointed straight out at the door and at Officer Davidson. Plaintiffs argue that the evidence supports a different version of

3

Denning's actions, one in which Denning held a gun, but did not point it at Officer Davidson. In support of th[at] assertion, Plaintiffs point to another account of the evening's incident prepared by Officer Davidson. In his one-page "Use of Force Report," Officer Davidson wrote, "He walked toward me. He stopped and pulled a handgun out of a black bag and continued to walk toward me. I yelled at him to drop the gun but he continued to walk toward me." Based on this statement, Plaintiffs argue that [] Denning's gun was not pointed at Officer Davidson.

Thereafter, the material facts surrounding the remainder of that night's events are again uncontested. Officer Davidson shouted to Officer Lyons—whose view of the apartment door was obstructed from his position on the lower landing—that the man had a gun. Officer Davidson then turned away from the door to retreat down the stairs, but could not see the stairs while his eyes adjusted from the well-lit apartment to the dark outdoors. The landing on which Officer Davidson stood was only as wide as the doorway, giving Officer Davidson no room to step out of Denning's direct path. As Denning continued to walk towards the door with the gun, Officer Davidson shouted twice at him to drop his gun. Denning did not drop his gun and continued walking towards the door. When Denning was about three (3) or four (4) feet from the door, Officer Davidson fired a single shot through the window of the door, striking Denning in the chest.

After he ascertained that Denning was on the floor and not moving, Officer Davidson kicked the door open and kicked the weapon away from Denning. Officer Davidson ordered Denning to get his hands out so that they were visible, but Denning replied that he could not get his breath. Officer Davidson reached down and pulled Denning's hands out from under him. Officer Lyons advised the dispatcher that Denning had been shot and called for an ambulance. Denning was transported by ambulance to Vanderbilt University Medical Center where he died from the gunshot wound. Samples taken during an autopsy later revealed that Denning's blood alcohol level was in the range of .12% to .13%.

*Denning v. Metro. Gov't of Nashville*, 564 F. Supp. 2d 805, 808-11 (M.D. Tenn. 2008) (footnotes and citations omitted).[3]

---

[3]For the sake of completeness, a few points deserve elaboration. First, Officer Davidson acknowledged repeatedly at his deposition that at no point did he ever identify himself as a police officer to Denning. Second, his initial failure to identify himself as a police officer when he knocked on the door was a deliberate decision based on tactical considerations. Third, at no point did Davidson hear Denning say anything—Denning did not make any verbal threats, nor did he ask who was at the door. Finally, when asked if he had any indication about what Denning could see at any point—including who was at the door—Davidson testified, "I don't know what he could see." He testified that he was wearing his badge—"shiny stuff"—but does not know whether Denning could

4

Plaintiffs filed their complaint on September 22, 2006. Count I alleged that the shooting violated Denning's constitutional rights under the Second, Fourth, Fifth, and Fourteenth Amendments—that the shooting was an excessive use of force and Officer Davidson's conduct constituted an unreasonable search and seizure, a violation of Denning's right not to be deprived of his life, liberty or property without due process of law, and a violation of Denning's right to bear arms. Count II alleged that the Metropolitan Government of Nashville and Davidson County (Metropolitan Government) "authorized, permitted, and tolerated the custom and practice of the unconstitutional and excessive use of force" by Officer Davidson by failing to adequately train, supervise, and discipline him and by "permitting the policy and custom of using unreasonable force to exist and continue, when [it] was on notice that such unreasonable force was being used prior to the wrongful shooting and killing of David Denning." Count III contained an allegation against Chief of Police Serpas—a count which was later dismissed without prejudice. Count IV alleged that defendants' "failures as stated represented conscious or reckless disregard of defendants['] acts or omissions and deliberate indifference to the rights of others and especially David Denning."

Defendants subsequently filed a motion to dismiss certain claims. The district court granted the motion in part and denied it in part, such that the remaining claims were Count I's Second, Fourth, and Fourteenth Amendment claims against Davidson individually and Count II's claim against the Metropolitan Government.

On October 1, 2007, defendants filed a motion for summary judgment, contending that plaintiffs had no valid Second Amendment claim; that plaintiffs did not show a custom, practice, or policy that caused Denning's death; and that Officer Davidson was entitled to qualified immunity

see his badge that night. There was no light on the porch where Davidson was standing.

5

on the Fourth Amendment claim because Davidson did not violate a constitutional right. Plaintiffs, opposing the motion, contended that whether Denning could discern who knocked at his door and whether Denning pointed his gun at Davidson were both in dispute. Plaintiffs further argued that Denning had a valid Second Amendment claim. Plaintiffs maintained that the Metropolitan Government's policy regarding the use of deadly force caused Denning's death. Finally, plaintiffs claimed that Officer Davidson was not entitled to qualified immunity because he used force that was excessive under objective standards of reasonableness.

The district court granted defendants' motion for summary judgment and dismissed all of plaintiffs' claims. *Denning*, 564 F. Supp. 2d 805.[4] In addressing whether Officer Davidson was entitled to qualified immunity on plaintiffs' excessive force claim, the court determined that Davidson's use of deadly force was "objectively reasonable" in light of Denning's picking up his gun, pointing it in Davidson's direction, and continuing to walk towards the door while ignoring commands to drop his weapon, and that Davidson "was forced to make a split-second decision that he was not safe and that retreat was not feasible." *Id.* at 814. Thus, the court concluded that as a matter of law Davidson "did not use excessive force in violation of Denning's Fourth Amendment rights." *Id.* at 815. The court found that plaintiffs had not presented a material question of fact regarding whether the gun was pointed at Davidson, as the evidence of record was not contradictory. *See id.*[5]

---

[4]Plaintiffs do not appeal the district court's granting of summary judgment to defendants on the Second Amendment claim.

[5]The court also observed that "the position of the gun in the suspect's hand is not dispositive in determining whether the use of force was excessive." *Denning*, 564 F. Supp. 2d at 815 (citing *Bell v. City of E. Cleveland*, No. 96-3801, 1997 WL 640116, at *4 (6th Cir. Oct.14, 1997) (per curiam), and stating that *Bell* "cit[ed] with approval appellate decisions finding reasonable use of

In dismissing plaintiffs' municipal liability claims, the court noted that there could be no such liability because plaintiffs had not established that Denning was deprived of a constitutional right. *Id.* at 816-17. The court further stated that even assuming plaintiffs established a constitutional violation had occurred, plaintiffs did not establish facts to support their claim that the Metropolitan Government was responsible for that violation: the police department policy at issue was not an illegal policy because it tracks the language on the use of deadly force in *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); plaintiffs did not present other evidence establishing an illegal custom, practice, or policy, nor did they show that any official was aware of illegal conduct or was deliberately indifferent; and plaintiffs did not introduce evidence showing a failure to supervise or train. *Denning*, 564 F. Supp. 2d at 817.

## II

We review de novo a district court's grant of summary judgment. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Factual evidence is to be viewed in the light most favorable to the non-moving party and all reasonable inferences must be construed in that party's favor. *See Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006).

Appellants confirmed at oral argument that, consistent with their brief, they are not appealing the district court's decision to grant summary judgment to defendants on plaintiffs' claim that Officer Davidson used excessive force. Rather, appellants maintain that although the district court addressed

force where the weapon was not pointed directly at the officer").

7

their excessive-force claim, it did not address their "illegal search and seizure" claim. Appellants' Br. 8; *see also id.* at 17 ("Plaintiffs contend that there *was an unconstitutional, forcible, physical entry* of the decedent's home by virtue of the act of defendant's firing into the home without identifying himself. The District Court's Order addresses the excessive force facet of Plaintiff's case, but fails to deal with the illegal search facet." (emphasis in the original)).

It is unclear to what extent appellants argue that the district court did not address their claim that there had been an unconstitutional "seizure," as opposed to an illegal "search." It is settled law that "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). The district court considered the reasonableness of this seizure when it determined that Officer Davidson's use of deadly force was objectively reasonable, as "Denning posed a serious threat to Officer [Davidson]'s safety such that Officer [Davidson]'s use of deadly force was permissible." *Denning*, 564 F. Supp. 2d. at 814. Plaintiffs have not explained how Davidson's use of deadly force can be deemed unreasonable under the Fourth Amendment where plaintiffs do not challenge the district court's conclusion that the use of deadly force was not excessive under the circumstances.

To the extent appellants maintain that the bullet piercing Denning's door and entering his house as a result of Davidson's firing of his gun was an unconstitutional "search" notwithstanding the district court's conclusion (which they do not appeal) that the use of force was objectively reasonable in light of the threat posed to Davidson, appellants offer no authority for the proposition that in this situation the officer's firing a bullet into the dwelling constituted an unlawful "search" under the Fourth Amendment. The Supreme Court has observed that "[w]hen the Fourth Amendment was adopted, as now, to 'search' meant '[t]o look over or through for the purpose of

8

finding something; to explore; to examine by inspection; as, to search the house for a book; to search the wood for a thief.'" *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (citing N. Webster, *An American Dictionary of the English Language* 66 (1828) (reprint 6th ed. 1989)). The bullet that entered Denning's home obviously could not "look," "explore," or "examine," nor did its entry facilitate such conduct.[6] Appellants' argument that Davidson's firing a bullet into Denning's home constituted an unconstitutional "search" is unavailing.

Finally, appellants contend that the district court erred when it dismissed their claim against the Metropolitan Government because the court employed the test for governmental liability for a "custom" and not for a "policy."[7] It appears to us that the district court considered both policy and custom. In any event, because appellants have not established that there was an unconstitutional deprivation of Denning's constitutional rights, their claim of municipal liability necessarily fails. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))).

---

[6]Officer Davidson's subsequent entry into the home after noticing Denning on the floor and not moving was objectively reasonable given that "[o]ne exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

[7]We recently pointed out that municipal-liability cases make such a distinction. *See Ford v. County of Grand Traverse*, 535 F.3d 483, 496 (6th Cir. 2008) (comparing *Miller v. Calhoun County*, 408 F.3d 802, 813 (6th Cir. 2006) ("Municipal liability may attach for policies promulgated by the official vested with final policymaking authority for the municipality.") with *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004) ("A municipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice.")).

**III**

For the reasons stated above, we AFFIRM.